

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 17, 2025**

_____
**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 21-41141-ELM |
| AUSTIN S. WILKINSON, | § | |
| | § | Chapter 7 |
| Debtor. | § | |
| | § | |
| CAROL M. FRENCH and | § | |
| KIPP MICKELS, | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Adversary No. 21-04049 |
| | § | |
| AUSTIN S. WILKINSON, | § | |
| | § | |
| Defendant. | § | |

## AMENDED MEMORANDUM OPINION

In this adversary proceeding, Plaintiffs Carol M. French ("**French**") and Kipp Mickels

("**Mickels**", and with French, the "**Plaintiffs**") filed their _Second Amended Complaint to_

_Determine Dischargeability Pursuant to Section 523 of the Bankruptcy Code_ (the "**Amended**

1

**Complaint**")[1] to seek a determination that the debt allegedly owed to them by Defendant Austin S. Wilkinson ("**Wilkinson**," the "**Debtor**," or the "**Defendant**"), the chapter 7 debtor in Bankruptcy Case No. 21-41141 (the "**Bankruptcy Case**"), is nondischargeable pursuant to sections 523(a)(2)(A) and 523(a)(6) of the United States Bankruptcy Code, 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).  Specifically, in connection with a contract under which Defendant constructed a barndominium on real property located at 4965 County Road 164 in Stephenville, TX, (the "**Barndominium**"), Plaintiffs allege Wilkinson is indebted to them for damages arising from Texas Deceptive Trade Practices Act ("**DTPA**") violations, breach of contract, negligence, breach of express and/or implied warranties, common law fraud, fraudulent inducement, and conversion.[2]  Furthermore, Plaintiffs contend that the foregoing debts either resulted from Wilkinson's false pretenses, false representations, or actual fraud, or resulted from a willful or malicious injury committed by Wilkinson, and as such, the debts should be excepted from Wilkinson's bankruptcy discharge.[3]

Responding in *Austin S. Wilkinson's Response to First Amended Complaint to Determina Discharability* (sic) *Pursuant to Section 523 of the Bankruptcy Code* (the "**Answer**"),[4] Wilkinson specifically denies all of French and Mickels' allegations, including that the parties entered into a written contract,[5] that he committed any fraudulent act in connection with the Barndominium project, that he is liable for any damages allegedly sustained by the Plaintiffs, and that the damages,

---

[1] *See* Adversary Docket No. 11 (the "**Amended Complaint**").

[2] *See* Amended Complaint, at pp. 9–17.

[3] *See Id*, at pp. 6–9.

[4] *See* Adversary Docket No. 7.

[5] *See* Adversary Docket No. 7, at ¶ 7.

if any, are nondischargeable.[6]   Additionally, Wilkinson asserts the Plaintiffs' failure to mitigate damages as an affirmative defense.[7]

On September 1, 2021, Wilkinson filed his *Counter-Complaint Against Carol M. French for Breach of Contract*, whereby he alleged that French breached the oral Barndominium contract that they had entered into by failing to pay Wilkinson's invoice.[8]   In their *Plaintiffs Carol M. French and Kipp Mickels' Response to Defendant Austin S. Wilkinson's Counterclaim*, French and Mickels deny Wilkinson's breach of contract allegation and pleaded the following affirmative defenses: Wilkinson failed to state a claim upon which relief can be granted; Wilkinson failed to mitigate his damages; and Wilkinson's breach-of-contract claim is frivolous and designed to harass, and is therefore sanctionable.[9]   The parties then conducted discovery.

On March 18, 2022, French and Mickels filed their *Counter-Defendant's* (sic) *Motion to Dismiss Counter-Plaintiff's Counter-Complaint and Brief*, which was amended on April 8, 2022.[10] On May 10, 2022, the Court issued its *Order Granting In Part and Denying In Part Counter-Defendant's Motion to Dismiss Counter-Plaintiff's Counter Complaint* (the "**MTD Order**").[11]   In the MTD Order, the Court dismissed Wilkinson's breach of contract claim to the extent that the damages, if any, exceed $2,604.17.[12]   Thus, Wilkinson's breach of contract claim against French is live insofar as the claim is for $2,604.17 or less.

---

[6] *See* Adversary Docket No. 7, at ¶¶ 8–25, 27–33, 35–36, 38–69.

[7] *See* Adversary Docket No. 7, at ¶ 70.

[8] *See* Adversary Docket No. 8.

[9] *See* Adversary Docket No. 10, 12.

[10] *See* Adversary Docket No. 82.

[11] *See* Adversary Docket No. 109.

[12] *See* Adversary Docket No. 109.

On March 18, 2022, Wilkinson filed *Austin S. Wilkinson's Motion for Summary Judgment as to All Claims Asserted by Plaintiff Kipp Mickels*[13] and an accompanying *Brief in Support*.[14] On September 25, 2022, the Court issued its *Order Granting in Part, and Denying in Part, Defendant's Motion for Summary Judgement* (the "**MSJ Order**").[15] In the MSJ Order, the Court granted Wilkinson summary judgement on the following claims as plead by Mickels: breach of contract, negligence, breach of warranty, fraudulent inducement, and conversion.[16]

At the time of trial, several causes of action were still live. All of French's causes of action were still live as plead. Mikels' claims of DTPA violations, common law fraud, and sections 523(a)(2)(A) and 523(a)(6) exceptions to discharge remained live. Wilkinson's sole live claim was a breach of contract counterclaim, with damages not to exceed $2,604.17.

After six days of trial, the Court took the matter under advisement.

Having now reviewed the Amended Complaint, the Answer, the parties' respective contentions and the joint factual stipulations from the Joint Pre-Trial Order,[17] the parties' other pre-trial submissions,[18] the parties' evidentiary submissions, and arguments at trial, the Court issues its findings and conclusions pursuant to Federal Rule of Civil Procedure 52, made applicable to this proceeding pursuant to Federal Rule of Bankruptcy Procedure 7052.[19]

---

[13] *See* Adversary Docket No. 70.

[14] *See* Adversary Docket No. 71.

[15] *See* Adversary Docket No. 160.

[16] *See* Adversary Docket No. 160.

[17] Adversary Docket Nos. 100 and 101 (the "**PTO**"). Adopted by Court Order at Adversary Docket No. 161.

[18] Wilkinson's Proposed Findings of Fact and Conclusions of Law, Adversary Docket No. 97; Plaintiffs' Proposed Findings of Fact and Conclusions of Law, Adversary Docket No. 98.

[19] To the extent any of the following findings of fact are more appropriately categorized as conclusions of law or include any conclusions of law, they should be deemed as such, and to the extent that any of the following conclusions of law are more appropriately categorized as findings of fact or include any findings of fact, they should be deemed as such.

### *JURISDICTION*

The Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and

157 and *Miscellaneous Order No. 33: Order of Reference of Bankruptcy Cases and Proceedings*

*Nunc Pro Tunc* (N.D. Tex. Aug. 3, 1984).   Venue of the proceeding in the Northern District of

Texas is proper under 28 U.S.C. § 1409.   The proceeding is a core proceeding within the meaning

of 28 U.S.C. § 157(b)(2)(B), (C), and (I).   Additionally, Plaintiffs and Defendant have consented

to this Court entering a final judgment.[20]

### *FACTUAL BACKGROUND*

On May 11, 2021 (the "**Petition Date**"), Wilkinson commenced the Bankruptcy Case with

the filing of his voluntary petition for relief under chapter 7 of the Bankruptcy Code (the

"**Bankruptcy Petition**").[21]

### A.)    The Parties, the Negotiations, and the Barndominium Contract

#### *(1.)    Austin Wilkinson's Construction Background*

Wilkinson has over a decade of experience in construction.   After graduating high school,

Wilkinson worked for Field Construction ("**Field**"), a general contractor, for roughly four years.

At Field, Wilkinson worked on custom homes, barndominiums, and other development projects.

Next, Wilkinson attended the Universal Technical Institute in Houston where he received diesel-

mechanic training.   He put that training to use at Siddons-Martin Emergency Center ("**Siddons-**

**Martin**"), a distributor and servicer of, among other things, Pierce-branded firetrucks.   Wilkinson

remained with Siddons-Martin for six months before moving to DNT Construction ("**DNT**").   At

DNT, Wilkinson first worked as a personal assistant to the business's owner, then as a construction

---

[20] *See* PTO; *see also* 11 U.S.C. § 157(d); *see also* Fed. R. Bankr. P. 7008.

[21] *See* Bankruptcy Docket No. 1.

superintendent, and finally as a project manager.  The projects he worked on included rail systems, shipping warehouses, and large developments.  When Wilkinson was working on a DNT project in a city, DNT provided Wilkinson with all building codes that the city had adopted, including the International Building Code.  After roughly ten months at DNT, Wilkinson worked at Halliburton for six months.

After his time at Halliburton, Wilkinson started his own general contracting company, Rockin A Enterprises, LLC ("**Rockin A**"), in 2018.  Wilkinson served as a general contractor on at least 13 jobs.[22]  Those jobs included multiple home remodeling projects, a foundation repair project, two barndominium construction projects, and the construction of a home with an attached workshop.[23]  Wilkinson testified that he billed these projects at a cost-plus 18–22% rate and that he had procured general liability insurance for some, but not all, of the projects.  Wilkinson also maintains that he adhered to any building codes and construction standards adopted by the town or county in which a particular project was located.

Rockin A utilized a singular bank account at First Financial Bank for all payments, disbursements, and receipts.[24]

### (2.)    *Carol French and Kipp Mickels*

French and Mickels divorced after 29 years of marriage in late 2019.  Post-divorce, French and Mickels maintained contact and continued to have friendly relations.

Being a passionate equestrian, French sought a home that could house her alongside her horses.  French has no relevant construction expertise.

---

[22] Ptfs' Exh. EEEEE, (Def.'s Second Supplemental Response to Interrogatories).

[23] *Id.*

[24] Ptfs.' Exh. R.

Mickels lives in California and works in construction. He has made several successful bids for state-government projects. In 2019, he was involved in a project to build a pad for a tract of 40 homes in California. It is unclear from his testimony whether he was hired to build the pad to provide equipment to the entity hired to build the pad, but it is construction related experience regardless. Beyond his involvement as French's co-plaintiff, Mickels has also served as an expert witness regarding a smattering of construction topics, including pad construction.

In 2019, French moved to Stephenville, TX, where she began living with a friend, Kim, who had hired Wilkinson to remodel her barndominium. Impressed by Wilkinson's work on Kim's barndominium and wanting to live in a home that could also house her horses, French decided to purchase a barndominium of her own.

French, with help from her ex-husband Mickels, purchased an unimproved parcel of realty for $121,000.00 in Erath County. Thereafter, French and Wilkinson commenced preliminary design and budgetary discussions.

### (3.)    *The Parties Contemplated a Strict Budget of No More Than $200,000.00*

Although cost was most certainly a factor for French, the parties dispute exactly when cost became a factor in this disagreement.

Wilkinson testified that, throughout the process, French made it clear that she was on a strict budget. According to Wilkinson, French stated that her divorce from Mickels and subsequent issues related to her living situation necessitated the cost restraints and communicated a $200,000.00 budgetary limitation after the parties commenced preliminary design discussions. Wilkinson testified that he strove to remain within French's budget.

At trial, French flatly denied ever telling Wilkinson she had a strict budget. Rather, French asserted that she only brought up cost as a factor after she had outlaid a substantial amount of money for an unfinished Barndominium.

The Court also heard testimony from Colby Pack, French's expert witness. Pack acknowledged that the French-Wilkinson Barndominium contract was for about $198,000.00 but further opined that he would have bid $240,000.00. Pack also testified that he did not ask French why she entered into a contract for less than $200,000.00.

After the project faltered and the parties' business relationship grew hostile, Wilkinson and French exchanged a series of emails. In one email sent to Wilkinson on September 22, 2020, French told Wilkinson, among other things, the following: "I fully trusted you and explained to you on multiple multiple (sic) times that *I couldn't afford to be taken advantage of* ."[25]

Given the testimony of Mr. Pack, and the fact that at no point in this Adversary did French or Wilkinson assert that the Barndominium contract was for more than $198,562.50, the Court finds that the parties entered into the Barndominium agreement contemplating a strict $200,000.00 budgetary cap from the outset.

### *(4.)    The Parties Agreed Not to Use Professionally Drawn Up Plans*

The 30' x 40' apartment component of the Barndominium was built according to hand-drawn plans drafted by Wilkinson.[26] On February 18, 2020, Wilkinson texted French a photo of this hand-drawn floorplan of the barndominium.[27] French responded by complimening Wilkinson on his creativity, noting that she "liked how [Wilkinson] found room for a pantry."[28] In an iterative

---

[25] Ptfs.' Exh CCC, at p. 1 (emphasis added).

[26] *See* Ptfs.' Exh. M.

[27] Ptfs.' Exh GGGGGG ("**Text Exchange**"), at p. 15.

[28] Text Exchange, at p. 16.

process, they exchanged adjustments to the drawing until, ultimately, Wilkinson texted French a hand drawn plan of the living quarters to which French responded with a thumbs-up emoji.[29] Wilkinson also shared his hand-drawn plans with some of the subcontractors, including Mr. Haney, who did framing work on the Barndominium project.

French wanted computer generated plans produced by Wilkinson. She testified that, after finalizing the layout of the Barndominium's apartment, Wilkinson promised he would send her "the drawings as soon as they are done." [30] She claimed that Wilkinson had computer software with which he could produce computer-generated plans and further explained that she wanted Wilkinson to utilize such technology.

Wilkinson, for his part, maintains that he does not have access to the types of computer programs capable of generating such plans.[31] Instead, Wilkinson wanted to use computer-generated plans drafted by a third-party professional. However, he credibly testified that it was not possible to hire a third-party professional and to stay under the $200,000.00 budgetary cap. Accordingly, the parties ultimately decided against utilizing computer-generated plans.

The Court did not hear any evidence tending to show that computer generated plans are more reliable than hand-drawn plans, nor did the Court hear any evidence tending to show that plans drawn up by a third-party professional, such as an architect, are more reliable than plans drawn up by a contractor. Further, while the Court heard evidence that Wilkinson's hand-drawn plans did not account for the thickness of the walls, the Court heard no evidence that plans

---

[29] Text Exchange, at 23; *see also United States v. Goodin*, 835 F. App'x 771, 775 (5th Cir. 2021) (interpreting "thumbs up" emoji as an affirmative response).

[30] Text Exchange, at p. 28.

[31] No party indicated which computer programs are suitable for this task.

produced by a third-party professional using a computer program would have accounted for the thickness of the walls.

The Court does find, based on Wilkinson's testimony, that use of plans generated by a third-party professional via a specialized computer program is best practice within the residential construction industry. The Court also finds that deviations from this best practice, while unusual, do happen. The Court further finds that French willingly accepted the risks of using hand-drawn plans, if any, that were associated with Wilkinson's use of hand-drawn plans in the construction of the Barndominium.

### (5.)    *After Negotiating the Price and Terms, the Parties Entered into an Oral Contract Coupled with a Bid Document Outlining Pricing*

The parties stipulated that they entered into a contract whereby Wilkinson would serve as a general contractor on the Barndominium project,[32] but the parties vehemently disagree as to whether that agreement was reduced to a formal written contract.

French and Wilkinson conducted their preliminary discussions via text message. On February 10, 2020, French texted Wilkinson a plat map containing, among others, the parcel of real property she intended to purchase.[33] On February 13, 2020, French texted Wilkinson an apartment floor plan along with photos of stained concrete floors, a kitchen, a bathroom, sinks, an overhead fan, and a kitchen island.[34] French told Wilkinson what she wanted, and Wilkinson responded with his own suggestions.[35] They continued exchanging ideas over text.

---

[32] PTO, at Ch. B, at ¶ a.

[33] Text Exchange, at p. 3–5.

[34] Text Exchange, at p. 7–15.

[35] *Id.*

On March 6, 2020, French and Wilkinson agreed to meet at the site on which the Barndominium would be built.[36]  French testified, and Wilkinson confirmed, that French and Wilkinson did in fact meet that day.

At the March 6, 2020, meeting, French alleges that Wilkinson presented her with a three-page construction contract containing all relevant features of the home, including the stained concrete flooring and entranceway that French wanted.  The alleged contract also enumerated potential issues and outlined remedies.  The document contained some prices and a term stating that the entire Barndominium project would be completed for no more than $195,350.00.

French testified that she consulted with Mickels before entering into the contract.  Additionally, French testified that she signed this contract on the back of Wilkinson's truck.  She claimed that she did not get a copy.  Afterwards, French spoke with Mickels about the contract; Mickels testified that French did not discuss with him the contents of the alleged written contract.

Wilkinson's version of events is different.  He testified that on March 6, 2020, he merely showed French the bid proposal on his laptop.  Wilkinson contends that nothing was printed and that nothing was signed during that meeting.

The lack of a written contract is not altogether unprecedented for Wilkinson.  He testified that for some prior jobs, he did use written construction contracts containing the agreed-upon price, terms permitting contractors to access the property, and standard boilerplate language.  Sometimes, the contract was drawn up for him by an attorney; other times, he used the customer's contract.  Whenever the arrangement involved a written construction contract, Wilkinson signed it.  However, at other times, Wilkinson did not use a written contract, opting instead for a handshake deal in combination with a bid document to outline the pricing.

---

[36] Text Exchange, at p. 39–41.

With respect to the Barndominium, Wilkinson testified that he and French entered into a handshake agreement and that he provided a bid document outlining the pricing and his general contractor fee.  Wilkinson could not produce the original bid document in discovery and claimed that he only possessed, and could only provide, a later copy containing all that French had paid as of June 17, 2020.[37]

Now turning to the admitted documentary evidence, the Court notes that French, via a text message sent to Wilkinson on July 13, 2020, asked Wilkinson for a copy of the "deal" she signed.[38] On July 15, 2020, French asked Wilkinson, again via text, for a copy of the "pricing."[39]

Ultimately, French failed to produce the document she claims is the contract, and Wilkinson was credible when he testified that there was no written "contract."  Therefore, the Court finds that the parties entered into a verbal Barndominium construction contract with a total price of $198,562.50 and with the pricing terms memorialized in the Project Overview.

The Project Overview[40] is the document governing the services and attendant costs of the Barndominium project, as summarized below:

| Details | Original Bid Amount ($) | Amount Paid | Percent Complete | Completion Status |
|---|---|---|---|---|
| Concrete | 12,000.00 | $15,173.00 | 100 | Complete |
| Metal Framing | 60,000.00 | $60,000.00 | 100 | Complete |
| Wood Framing | 20,000.00 | $24,687.00 | 100 | Complete |
| Plumbing | 8,000.00 | $5,461.00 | 75 | Incomplete |
| Electrical | 8,000.00 | $6,356.25 | 75 | Incomplete |
| HVAC | 8,000.00 | $7,300.00 | 90 | Incomplete |
| Spray Foam | 6,000.00 | $6,637.00 | 100 | Complete |

---

[37] Ptfs.' Exh. LL (**"Bid Document"**).

[38] Ptfs.' Exh. GGGGGG, at p. 92.

[39] Ptfs.' Exh. GGGGGG, at p. 97.

[40] Ptfs.' Exh. JJJJ; Def.'s Exh. 7.

| Drywall | 5,000.00 | $4,500.00 | 100 | Complete |
|---|---|---|---|---|
| Tape Float Texture | 5,000.00 | $3,375.00 | 100 | Complete |
| Trim | 5,000.00 | | 0 | Incomplete |
| Paint | 2,500.00 | | 0 | Incomplete |
| Finish-out | 10,000.00 | $2,895.00 | 30 | Incomplete |
| Well | 13,000.00 | $12,852.17 | 100 | Complete |
| Septic | 9,000.00 | | 0 | Incomplete |
| Pad | 5,000.00 | $5,625.00 | 100 | Complete |

Additionally, French wanted certain services separate from the original contract.  These

"Change Orders"[41] include the following:

| Details | Amount |
|---|---|
| Sewer for Trailer – Texas Restroom – INV #8 – CHECK #1015 | $735.75 |
| Driver Through Trailer Carport – INV #7 – CHECK #1016 | $7,481.25 |
| Cover Over Purposed Horse Stall Area – INV #7 – CHECK #1016 | $6,937.50 |
| Front Gate Not Paid to Rockin A Construction | ??? (sic.) |
| Concrete Ungraded to Custom Stain NOT PAID to Rockin A Construction | $6,760.00 |

---

[41] Ptfs.' Exh. JJJJ; Def.'s Exh. 8.

### (6.)    *Mickels Was a Stranger to the Barndominium Contract*

Mickels testified he is a part or co-owner of the Barndominium and a party to the French-Wilkinson Barndominium construction contract.  On cross examination, Mickels admitted that he neither signed nor saw the contract.  Further, he admitted that Wilkinson made no representations to him (Mickels) before French entered into the Barndominium contract.  He did speak with French about the contract, but he did not pay Wilkinson any money.

Rather, Mickels's ownership interest in the property is predicated on his establishing – in June or July of 2020 – an Edward Jones retirement account with a balance of $65,000.00 for the benefit of both himself and French.  French had access to the money, but Mickels admitted that none of the $65,000.00 in the Edward Jones account was used to pay for the Barndominium construction project.

As a matter of fact, the Court finds that Mickels is not a party to the Barndominium contract.  Further, the Court finds that no representation made by Wilkinson to Mickels factored into French's decision to enter into the Barndominium contract.

## B.)    Wilkinson's Alleged Miscellaneous Representations to French and Mickels

Wilkinson made several representations to French and Mickels, respectively.

### (1.)    *Alleged Representations Made to French*

In addition to the representations discussed above, French rests her DTPA and fraud claims on the following alleged misrepresentations made by Wilkinson.

First, that Wilkinson misrepresents the costs of projects and then routinely sues his customers to collect accounts receivable.  The customers, French testified, owed Wilkinson money because Wilkinson went over budget on their respective projects.  He subsequently "took property" to satisfy these outstanding judgments.  No documents tending to substantiate French's claim of

Wilkinson's litigious nature were introduced into evidence. Wilkinson also credibly denied these allegations, going so far as to say that he never sued a customer. The Court finds that Wilkinson does not have a history of overcharging, of suing customers, or of taking their property to satisfy any outstanding amounts owed.

Second, French alleges that Wilkinson misrepresented that he had liability insurance.[42] French introduced no evidence substantiating this alleged representation about liability insurance. Additionally French introduced no evidence that her decision to enter into the Barndominium contract was impacted by any alleged representation as to liability insurance. Further, Wilkinson highlighted that he was not required to have liability insurance. The Court finds that Wilkinson did not represent to French that he had liability insurance, and that the lack of a representation with respect to insurance was immaterial.

Ultimately, these unsupported allegations cast doubt over French's credibility as a witness.

### (2.) *Alleged Representations Made to Mickels*

Mickels testified that he first met Wilkinson at French's friend Kim's house. The two men had no substantial conversations until work on the Barndominium commenced.

In May 2020, Mickels and Wilkinson met at the Barndominium site and discussed the entryway to the property, culverts, and grading around the Barndominium. Mickels brought six-foot tall gates, poles on which to hang the gates, and various other items to support the gates. Mickels made no mention of any issues relating to the pad or any other topic.

In July 2020, Mickels returned to the property and again met with Wilkinson to discuss culverts, dirt work, and the safe room on the property. Mickels testified that he and Wilkinson

---

[42] Amended Complaint, at ¶ 31.

discussed the flat metal casing to be placed in the safe room. Wilkinson also sought Mickels'
opinion with respect to the placement of the door to access the safe room's heating system.

Ultimately, Mickels testified that Wilkinson represented that he would do the following:
install gates; install two culverts, one on the street side and one on the road base; frame and install
a door; and install the road base. These work items were part of the French-Wilkinson
Barndominium contract and the timing in which these work items were performed fell within
Wilkinson's discretion. Further, this representation is related to future work and could not be
categorized as a statement of fact. To the extent that it is an opinion, Wilkinson and Mickels both
have construction experience, and neither took advantage of another with less experience and
knowledge.

### C.)   Wilkinson Constructs the Barndominium

Wilkinson and his subcontractors began work on the Barndominium project in March
2020.[43] The beginning of construction coincided with the COVID-19 outbreak, which was
declared both a pandemic and a nationwide emergency. The resulting governmental policies
aimed at reducing the spread of COVID-19 severely impacted commercial enterprises in Texas.[44]
Wilkinson's uncontroverted testimony was that raw materials, including lumber and sheet rock,
were in short supply and became significantly more expensive. Accordingly, the Barndominium
project became uneconomical for Wilkinson. Nevertheless, Wilkinson endeavored to make good
on his initial promise that he would complete French's Barndominium within her budget.
Wilkinson ceased construction work on the Barndominium in September 2020 after French failed

---

[43] PTO, at Ch. B, ¶ b.

[44] *See, e.g*, *Vizza Wash, LP v. Nationwide Mut. Ins. Co.*, 469 F.Supp 3d 1029, 1033 (W.D. Tex., 2020) (dismissing
suit by a business owner against an insurance company that denied the business owner's claim for covid-19
business-income-related losses).

to pay his September 14th invoice for $3,000.00 for "Finishout" plus a 12.5% general contractor fee of $375.[45]

Wilkinson used several subcontractors on the Barndominium project. He acknowledges, however, that he failed to provide to French a list of subcontractors as required by the Texas Property Code.[46] The subcontractors who were identified and who testified at trial include the following: Travis Robertson, a Texas-licensed Responsible Master Plumber who owns TX Plumbing Service & Repair, LLC; Tommy Ruderer, a metalworker who owns Tommy Ruderer Construction; David Ellibee, a heating, ventilation, and air conditioning ("**HVAC**") specialist who owns Ellibee Air Conditioning and Refrigeration; Andrew Haney, a builder who owns AFC Painting and Remodeling ("**AFC**")"; Abel Gamez, who completed the Barndominium's concrete foundation; and Rustin Benke, a welder and excavation specialist who owns Benke Enterprises.

The Court also heard testimony on the Barndominium's construction from the following witnesses: French, as a plaintiff; Mickels, as a plaintiff; Mickels, as an expert; Andrew Burton Sherwood, French and Mickels' valuation expert; Colby Pack, French and Mickels' valuation and construction expert; Wilkinson, as defendant; French, in rebuttal of Wilkinson; Mickels, in rebuttal of Wilkinson; and Johnny Tate, a real estate agent and appraiser who provided appraisal services.

French and Mickels claim damages related to (1) Wilkinson's defective construction of the incomplete Barndominium; and (2) Wilkinson's overcharging of French and Mickels, either by billing for unperformed work or overbilling for work performed.

---

[45] See Def.'s Exh 4. Invoice 103.

[46] *See* PTO, at Ch. B, ¶ r; Tex. Prop. Code. Anon. § 53.256.

17

### (1.)    *Barndominium Construction Issues*

Construction of the Barndominium began in March 2020 and ceased in September 2020.[47] Until September 2020, French was generally hands-off with respect to construction. Beyond general knowledge, French had minimal expertise about the technical aspects of homebuilding. French entrusted Wilkinson, in his role as general contractor, the responsibility of ensuring efficient progression of the Barndominium project.

While construction was ongoing, French moved onto the property and lived in a mobile trailer alongside other trailers housing her horses. There was no preplanning regarding her decision to move onto the property. Nevertheless, Wilkinson accommodated French by arranging for her trailer to have electricity and for her horse trailers to have water. While living on the property, French had the opportunity to monitor the work on the Barndominium.

Mickels and Wilkinson had two friendly visits at the Barndominium worksite: once in May 2020 and once in July 2020. Mickels also separately ordered extra work to be done on the Barndominium, including hiring Tommy Ruderer to put up trailer covers. French's failure to pay Wilkinson's September 14, 2020, invoice triggered Wilkinson's refusal to continue working. French did not hire another contractor to finish the Barndominium, nor did she take any steps to mitigate any damages to the existing structure.

The Court evaluated over 100 admitted exhibits in its review of the Barndominium's construction. Coupling this review with the testimony of the above-mentioned witnesses, the Court evaluates the Barndominium's construction on an item-by-item basis.

---

[47] PTO, Ch. B, at ¶ b.

### (a.)    The Pad

Rustin Benke and his crew built the pad, upon which the foundation would rest, in approximately four or five days.  He has experience building pads in Erath County.  French was present on the property during pad construction and appeared content with the work.  French voiced no concerns when Benke visited with her in the evenings.

Benke has built many pads in Erath County.  Erath Couty has no requirements with respect to pad size or overbuild dimensions.  Benke testified that pads in Erath County normally had an overbuild of three feet.  In this project, the apartment portion of the Barndominium had a three foot overbuild, but the horse stalls had little-to-no overbuild.

Benke ordinarily does not send out soil to be tested and did not seek a third-party test of the soil used in this Barndominium project.  "Select fill," a combination of sand and clay that has been tested to ensure it will hold together, was not used in the pad's construction.[48]  Given the cost of Select Fill—estimated at trial to be around $10,000.00 for this project—Benke and Wilkinson opted not to use Select Fill.  French was made aware that Select Fill was not being used and she raised no concerns.

After pouring, the pad was not level.  The elevation of the south side was three to four inches different than the rest of the Barndominium's pad.  Abel Gamez, the concrete foundation constructor, testified that he and his team used forms to ensure the unlevel pad would not impact the home's foundation.

Additionally, the perimeter of the Barndominium partially eroded.[49]  Erosion may result from a failure to pack the soil from the pad properly, but erosion also occurs with the passage of

---

[48] *See* Ptfs.' Exh. N, at 1.

[49] Ptfs.' Exh. GGG.

time.   Testimony from a structural engineer with respect to the impact of erosion on the Barndominium's foundation would have been helpful, but the Court heard none.

On balance and given that the Barndominium project had a strict budget, the pad was sufficiently constructed.

### (b.)    The Foundation and Porch

The foundation was built by Abel Gamez, a tradesperson with twenty years of experience in the concrete industry.   Gamez also provided concrete and other necessary materials.   He is neither licensed nor insured.   Although Wilkinson hired Gamez as a subcontractor, Wilkinson did not micromanage Gamez's work.

The pad was already in place when Gamez began pouring concrete.   Gamez first trenched two feet under the pad into undisturbed soil.   During this process, he utilized forms to ensure the concrete he poured was level atop the unlevel pad.

Gamez poured the Barndominium's living quarters slab and the barn's curb separately and subsequently connected them with rebar.   Gamez drilled holes in the slab and curb and then placed rebar within the holes and forged a connection using tie wire.   Although Gamez believed that the Barndominium's foundation required piers because the soil was not adequately stiff, he did not use piers because he was not instructed to do so.

Additionally, the Barndominium's foundation had surface cracking.[50]   While surface cracking is normal and expected, cracking in the foundation's slab or in internal areas would evidence a faulty foundation.   The Court heard no evidence indicating that the Barndominium's foundation slab was cracked, nor any evidence that the internal areas of the Barndominium had

---

[50] *See* Ptfs.' Exh. LLL.

cracks in their foundation.   Indeed, French's expert, Colby Pack, did not even look at the foundation's slab.

To investigate the integrity of the slabs, Mickels' testified that he used a pointed shovel to dig eight and a half inches into the soil under the foundation.  Based on this investigation, Mickels believed that the living quarters' slab was not connected to the barn's curb.  He also took photographs of the Barndominium at various angles[51]; these photographs were taken after construction ceased.  He acknowledged that other photographs do show that rebar and tie wire connected the pad and curb.[52]

Mickels's investigation also led him to conclude that the barn's curb lacked footings.[53] This would be an issue if the soil over which the Barndominium's foundation was constructed could not compact.  However, the Court heard no credible testimony that the soil was of a type that failed to compact.  Indeed, the Court heard the opposite—the soil, the pad, and the foundation were sufficient—from Rustin Benke and Abel Gamez, the individuals most intimately informed about for the pad and foundation, respectively.

Gamez testified that he did utilize trenched footings.  The images of the Barndominium's curbs cast doubt on Gamez's testimony as they show a lack of trenched footings.  Gamez was not sued for his work, and despite the minor surface cracking, the foundation suffered no major faults.

 The Barndominium does not currently have a porch, contrary to the contemplations of the parties.  Exercising his discretion as the general contractor, Wilkinson planned to construct a lean-to porch tied into the Barndominium's framing.  To construct the porch, Wilkinson planned to drill holes in the existing foundation, add a counter sinker, and then hammer rebar into those holes.

---

[51] *See* Ptfs.' Exh. NNNNNN, OOOOOO, & PPPPPP.

[52] *See* Ptfs.' Exh. SSSSSS.

[53] *See* Ptfs.' Exh. PPPPPP, QQQQQQ, RRRRRR, SSSSSS, TTTTTT.

Afterwards, concrete would be poured around the posts for stability. This method could have worked had he been allowed to complete the project, and accordingly, the Court finds that the Barndominium could have supported a porch.

### (c.)    Measurements of the Home

The measurements identified in the hand-drawn plan Wilkinson utilized for the Barndominium project did not match the measurements of the incomplete structure. For instance, the hand-drawn, two-dimensional drawing of the Barndominium did not account for the width of the walls of the completed structure. Wilkinson is an experienced builder and appreciated that a two-dimensional drawing would not account for the width of the walls. Similarly, French, who testified that she had ample opportunity to consult with construction-expert Mickels, should have appreciated that a two-dimensional drawing would not account for the width of the walls.

The drawings were, according to Wilkinson, a "rough draft."[54]  However, the subcontractors ultimately relied on other documents during construction. Travis Robertson, the plumbing subcontractor, credibly testified that he did not use the hand-drawn plans when he performed the plumbing work.[55]  Instead, he relied on more detailed documents that outlined the measurements.

French failed to produce evidence tending to show that the hand-drawn plan's failure to account for the width of the internal walls harmed the still-incomplete structure.

---

[54] Ptfs.' Exh. M.

[55] The plans sent to Travis Robertson were the same as those produced in evidence. *Compare* Ptfs.' Exh. M, *with* Ptfs.' Exh. FFFFFFF.

### (d.)   The Safe/Laundry Room

To save money and maximize the use of space, French and Wilkinson agreed to include a hybrid saferoom that also housed a washer and dryer.[56]  The saferoom included approximately 52.5 inches of space for the washer and dryer.[57]  The saferoom also had a washer box with supply line attachments[58] and a drain.[59]  French wanted a side-by-side washer and dryer.  A standard side-by-side washer and dryer set requires roughly 60 inches of space.   Thus, most side-by-side washer and dryer sets would not fit within the safe room.   The Court heard uncontroverted testimony that certain economical washer and dryer sets could fit within the space in the saferoom and that French wanted an economic size washer and dryer.  Thus, Wilkinson represented to French that she would have the space necessary in the saferoom to accommodate an economic size washer and dryer set.

The plans also contemplated the inclusion of a toilet, sink, and vanity in the safe room.[60] French envisioned that the door to the safe room would open inwards.  Construction halted before the placement of a door to the saferoom.  As the Barndominium currently stands, if an inward-opening door were included in the saferoom, its path would be obstructed by the inclusion of the toilet, sink, and vanity.  Wilkinson testified that other door options could work, including the use of a pocket door or a bifold door.   Additionally, the framing subcontractor, Andrew Haney, testified that the saferoom's framing was incomplete.

Initially, the plan was to construct the saferoom with haydite block, per Wilkinson's suggestion.[61]   Once construction began, Wilkinson realized that, because the saferoom also

---

[56] See Ptfs.' Exh. OOO.

[57] Ptfs.' Exh. AAAA.

[58] Ptfs.' Exh. WWW.

[59] Ptfs.' Exh. XXX.

[60] Ptfs.' Exh. M.

[61] Ptfs.' Exh. GGGGGG, at p. 34–35.

23

required plumbing for the toilet and sink, building it out of haydite block would have been more expensive than he initially anticipated.  Further, the use of haydite block would have made it more difficult for the saferoom lock to function and would consequently impinge upon the desired utility of the saferoom.  Accordingly, in July 2020, French and Wilkinson agreed to instead build the saferoom out of a steel ribcage, which was cheaper than haydite block and would better align with the overall goals of the project.

Tommy Ruderer installed the steel cage by bolting and welding it to the ground. Additionally, the frame is rated for winds up to 125 miles per hour.

Andrew Haney testified that a saferoom built using haydite blocks would have provided more safety than a saferoom constructed out of a steel cage, but Haney also testified that he has seen tornados rip above-ground saferooms from their foundations.  Additionally, he testified that the saferoom could be widened to accommodate a door.

French did not receive the saferoom that Wilkinson represented she would receive.  Despite expecting the saferoom to fit an economic size washer and dryer set, French did not purchase a washer and dryer set.  Mickels, to whom Wilkinson made no representations with respect to the size of the washer and dryer space in the saferoom, purchased a standard washer and dryer set from Best Buy.  He did not elucidate any evidence as to the cost of the set he bought or any related damages.

While French and Mickels did dedicate considerable trial time to the saferoom's deficiencies, they provided the Court with no basis, beyond a total valuation of the Barndominium structure, for calculating any damages arising from the insufficient saferoom.  Accordingly, French is entitled to no damages with respect to the insufficiently constructed saferoom.

24

### (e.)    Bathrooms

The Barndominium has a master bathroom and a guest bathroom.  Each was to house a double sink, or vanity, alongside a toilet.  At the initial planning stages of the Barndominium project, the parties contemplated that the bathrooms would house double sinks. [62]

French testified that it did not look like the space in the bathrooms could hold a double sink and a toilet.  Colby Pack also testified that there would not be enough space for a double sink and a toilet in the bathrooms.  Travis Robertson, meanwhile, testified that double sinks and a toilet could fit into the bathrooms.  The conflicting testimonies each referred to the same image of an empty room with an outstretched, illegible measuring tape which provided minimal information to the Court.[63]

All of the actual plumbing work was to be done by Travis Robertson, a Texas State Board of Plumbing Examiners certified plumber with 20 years of experience.  This work included installing pipes and water closets,[64] supply line cutoffs,[65] a washer box,[66] a toilet and double vanity,[67] and a shower.[68]  The completed plumbing work was done in accordance with the relevant state codes.

The plumbing work, however, remains incomplete.  No toilets, sinks, or showers were installed.  The bathtub required attention from a tile specialist.[69]  The remaining steps to ensure

---

[62] *See* Text Exchange, at p. 12.

[63] *See* Ptfs.'s Exh. QQQ.

[64] Ptfs.' Exh. PPP.

[65] Ptfs.' Exh. XXX.

[66] Ptfs.' Exh. WWW.

[67] Ptfs.' Exh. QQQ.

[68] Ptfs.' Exh. PPPPP.

[69] Ptfs.' Exh. CCCC.

the bathroom was fully operational would have been completed during the finish out stage of construction.   Based on conflicting testimony and the obfuscated photographs presented at trial, the Court declines to find that the bathrooms were insufficient as to size and performance.

### (f.)   Double Doors

The Barndominium was supposed to have French-style double doors.  A standard, French-style double-door is six feet across.  Currently, the opening to the Barndominium is less than six feet across.[70]  Nevertheless, Andrew Haney, who did the framing work on the Barndominium, testified that a standard, French-style double door could fit in the Barndominium's opening.  At worst, per Andrew Haney, the sheet rock could be modified to extend the opening if it was not big enough to accommodate the double doors.   Additionally, French could have raised the double-door issue, if any, during the final walkthrough.

Consequently, because Wilkinson was not permitted to complete the Barndominium, French is not entitled to any damages stemming from the double doors.

### (g.)   Breaker Box Location

The Barndominium's electrical breaker box is currently located within a closet.[71]  Colby Pack's uncontroverted testimony was that the breaker box's placement violates code.  Per relevant codes, breaker boxes cannot be hidden and must be in an easily accessible location.

To potentially remedy the situation, Wilkinson suggested placing the breaker box on the outside of the Barndominium.  Moving the breaker box at the construction, finish out, or final walkthrough stages would have been possible.  There is no indication that Wilkinson would not have moved the breaker box had it been brought to his attention.

---

[70] Ptfs.' Exh. TTT.

[71] Ptfs.' Exh. RRR.

Despite the placement of the breaker box indicating insufficient construction, neither party testified as to the cost of rewiring the home to ensure the breaker box is in a satisfactory location.

**(h.)    HVAC System Location**

An air conditioning system includes an indoor unit, an air handler, a line set, an outside condenser, ducts, and controls.  David Ellibee, a licensed HVAC contractor with over 10 years of experience, was hired by Wilkinson and performed all of the Barndominium's HVAC work.

A disagreement arose regarding the location of the air-conditioning unit.  French wanted the air-conditioning unit installed in the Barndominium's attic.  After looking at the attic, Ellibee determined that the unit would not fit in the attic.  The attic was too short and would have prevented Ellibee from accessing the unit.  Wilkinson told Ellibee to install the unit in the horse barn portion of the Barndominium structure.[72]  Ellibee and French never spoke about the placement of the air-conditioning unit in the horse barn.

A barn is a dirty environment with odors that would be obviously unpleasant inside a home.  Here, because the air-conditioning unit is sealed, contaminants and smells would only spread into the Barndominium's living quarters if the unit were opened.  While air conditioning units are not ordinarily opened and exposed to the surrounding environment, units must be periodically opened to change filters.  Ellibee acknowledged that horse barn smells could seep into the air-conditioning system during a filter change.

The air conditioning system here is insufficient.  Its placement in the Barndominium's barn comes with a substantial risk of contamination, and French was not given the opportunity to evaluate the risk.  Again, neither party testified as to the cost of moving the A/C unit.

---

[72] Ptfs.' Exh. BBBBBB.

### (i.) Driveway

The Barndominium's "driveway" is incomplete.  Indeed, French's irritation that Wilkinson had not completed the dirt work for the Barndominium's driveway was one of the reasons that she chose not to pay Wilkinson's September 14, 2020, invoice.  Though her messages and emails used the singular term "driveway," French was referring to two distinct roadways.

First, "driveway" referred to the entrance from the county road into the Barndominium. French texted Wilkinson on May 18, 2020, the following: "how long do you think before driveway will be in?"[73]  Wilkinson responded on May 19, 2020, that he would put it in "today."[74]  This driveway (the "**May Driveway**") was constructed and subsequently utilized by French while she lived on the property during construction.  Rustin Benke installed the May Driveway and neither party questioned the quality of the May Driveway.

Second, "driveway" referred to a paved road leading from the county road to the Barndominium's yet to be constructed porch.  On September 22, 2020, Wilkinson informed French via email that he "will not be able to continue working on the project until" French paid the September 14, 2020, invoice.[75]  Wilkinson explained that French wanted him to install the "driveway" (the "**September Driveway**") and two culverts, and that she was withholding payment until he installed this driveway.  At this stage of construction, subcontractors were still utilizing heavy machinery which would have created a high likelihood of damage to the driveway. Accordingly, it would have made little sense to construct the September Driveway at this stage.

Later, Mickels paid for Rustin Benke to install culverts and a road base.  This was a separate transaction between Mickels and Benke.  No money went to Wilkinson, and Wilkinson did not

---

[73] Text Exchange, at 63.

[74] *Id.*

[75] Ptfs.' Exh. CCC.

perform any work on the September Driveway.  French also testified that she hired Sean Johnson to finish the September Driveway.

The May Driveway was sufficiently constructed, and Wilkinson's refusal to construct the September Driveway while other parts of the Barndominium still needed work was reasonable. Therefore, French is entitled to no damages related to the construction of either "driveway."

### (j.)    Septic System

The incomplete Barndominium structure lacks a septic system.  The project had not progressed to the point at which a septic tank would be installed.  According to testimony from French and Colby Pack, the proposed location of the septic tank would have violated "code."[76] Specifically, the septic tank would have allegedly been located down a hill such that it would run uphill.

Wilkinson did not install the septic tank, and there have been no actual issues arising from the septic tank.  French has suffered no damages arising from the unconstructed septic tank.  The lack of a septic tank does, however, impact the valuation of the Barndominium structure.

### (k.)    Value of the Incomplete Barndominium

The Court heard conflicting testimony on the value of the incomplete Barndominium structure.

Andrew Burton Sherwood, a certified real estate appraiser with 17 years of experience, appraised the Barndominium in January 2022.  Sherwood testified that he has completed over 1,000 appraisals and is familiar with both Stephenville, TX, and Erath County, TX.  In his appraisal, he determined that the land was worth $140,000.00 and that the only improvement with any monetary value was a shed worth $35,000.00.  The Barndominium structure built by

---

[76] *See* Ptfs.' Exh. UUU.

Wilkinson had, in Sherwood's estimation, zero value. Sherwood based this zero-value appraisal on insufficient site preparation and construction defects, including the lack of a porch and external erosion. Demolition costs would be offset by the salvage value of the materials utilized to build the Barndominium.

Sherwood did not consult anyone with expertise on foundations. Instead, he consulted with a few local realtors and Colby Pack. Pack is a contractor with over 12 years of construction experience who builds approximately four-to-five custom homes annually. Pack testified that as of 2022, he sat on the Stephenville Board of Adjustments, a local governmental agency that deals with property valuation issues. Pack holds no licenses and based his opinion on a visual site-check he performed of the incomplete Barndominium.

Additionally, Pack and Wilkinson are competitors. Further harming credibility, Pack is also married to Mackenzie Welch, an attorney who represented French in her dispute with Wilkinson before the filing of the bankruptcy and this adversary.[77]

Pack visited the Barndominium four times. He took photographs of both the interior and exterior.[78] As discussed above, Pack testified that the Barndominium had a multitude of construction defects. These include the pad's insufficient overbuild; external erosion; a safe room that was too small; a safe room that did not have metal frames bolted to the ground; an HVAC system suspended in the Barndominium's barn; a deficient foundation; plumbing that was set incorrectly; insufficient space for a vanity in the laundry room; and an insufficient foundation to support a porch.

---

[77] *See* Ptfs.' Exhs. HHHH.

[78] *See, e.g.*, Ptfs.' Exhs. GGG & HHH.

Pack acknowledged that his investigation was, essentially, surface level. He also acknowledged that he is not a plumbing expert and further acknowledged that the plumber, Travis Robertson, does good work. He continually asserted the construction defects violated a "code" but failed to identify which code and whether such code governed residential construction projects in Erath County.

Based on the aforementioned issues, Pack determined that the Barndominium, with its irredeemable foundation, needed to be demolished at an estimated cost of $48,000.00. Further, the Barndominium living quarters would need to be rebuilt at a cost of roughly $240,000.00, and the Barndominium's barn would need to be rebuilt at a cost of $65,000.00. Pack testified that if he were bidding on the Barndominium project, he would have bid $240,000.00. Pack offered no testimony as to the cost to complete the Barndominium.[79]

Mickels also provided expert testimony. His testimony was based on a cursory inspection of the Barndominium, including the use of a shovel to dig into the soil. The thrust of Mickels testimony was that Wilkinson's work on the pad and foundation was deficient because the work failed to adhere to the standards prescribed by certain international codes. Erath County has not adopted any such codes—a fact that Mickels did not seem to know. Mickels' testimony on this issue was not credible.

Jonny Tate, a licensed real estate broker and residential appraiser, provided expert testimony on behalf of Wilkinson. Tate has lived and worked in Erath County his entire life. Tate inspected the Barndominium on January 27, 2022.

Tate appraised the value of the incomplete Barndominium by first, determining the value of the land based on comparable properties within a 10-mile radius. Next, he compared the

---

[79] French's counsel, in closing, stated that Pack testified that it would cost "$96,000.00" to finish the Barndominium. The Court did not hear Pack testify to this amount.

improvements on the land—the unfinished Barndominium—to other similar Barndominiums, which were worth roughly $185.00 per square foot. Finally, Tate discounted his valuation to account for the Barndominium's unfinished state, including its lack of a septic system.

Applying the foregoing approach, Tate determined that French's land is worth $150,000.00, the improvements on the land were worth $25,000.00, and the materials utilized were worth $175,000.00. Tate opined that the $175,000.00 valuation for materials accounted for an incomplete barn structure.

The Court questions the credibility of these experts. Pack is intimately associated with French vis-à-vis Pack's wife, French's former attorney. Pack also opined on foundation issues despite lacking expertise in those issues. Further, Pack's testimony was, in essence, speculation on a host of construction defects that would arise once Wilkinson (or someone else) attempted to finish the Barndominium's construction.

Tate, for his part, employed a valuation analysis that relied heavily on assumptions. He assumed that the Barndominium would be completed with no issues and valued it in that hypothetical completed state. While it is true that he discounted the valuation to account for the Barndominium's incomplete state, Tate did not explain how he arrived at the discount rate.

The Barndominium is currently unfinished and therefore not currently fit for habitation. Because this dispute arose while the Barndominium was still incomplete and many of the alleged issues could have been fixed had Wilkinson been paid and continued to work on construction, the court is deeply unconvinced by Pack's testimony. The Court finds that Tate's valuation is the more reliable valuation. Therefore, the structure is worth $175,000.00, the cost of the materials used to build the structure.

### (2.)    *Wilkinson Overbilled French $6,378.45*

The Barndominium contract was a cost plus 12.5% arrangement:  French was expected to pay the cost of the project plus a 12.5% general contractor's fee (the "**GC Fee**").  As discussed above, the total contract price, inclusive of the GC Fee, was $198,562.50.

### (a.)    **Wilkinson's Invoices and French's Corresponding Checks**

Throughout the process, Wilkinson would invoice French and French would promptly pay the invoice.  The invoices tabulated the work performed or materials purchased alongside a corresponding price figure.  At the bottom of each invoice, a subtotal was given.  Afterwards, the GC Fee was listed.  The total consisted of the subtotal plus the GC Fee.  If French wanted something changed, amended, or added, Wilkinson would enter a "change order" and add the extra work and costs to the bid document.[80]

Wilkinson's invoicing and billing practices were inconsistent—he would sometimes pay subcontractors after receiving payment from French, but at other times, he would pay subcontractors before billing French.  Due to COVID-19-related issues, Wilkinson occasionally sent subcontractors supplemental, ad hoc payments to ensure that the Barndominium project remained on track.  He would at times recoup these expenditures from French's checks.

The following is a tabulated breakdown of the invoices sent by Wilkinson to French and the correlating payments sent by French to throughout 2020:

| Date (2020) | Invoice Number | Subtotal ($) | Total ($) | Was it paid? | Date | Check No. | Amount towards construction ($) | Amount with GC Fee ($) |
|---|---|---|---|---|---|---|---|---|
| 4/1 | 101[81] | 5,000 | 5,625 | Yes | 4/2 | 1005[82] | 5,000 | 5,625 |

---

[80] *See* Ptfs.' Exh JJJJ.

[81] Ptfs.' Exh. S.

[82] Ptfs.' Exh. KKKK.

33

| 4/23 | 10[83] | 2,750 | 3,093.75 | Yes | 4/27 | 1006[84] | 2,750 | 3,093.75 |
|------|------|------|------|------|------|------|------|------|
| 5/7 | 103(1)[85] | 13,487.45 | 15,173.38 | Yes | 5/8 | 1008[86] | 13,487.45 | 15,173.38 |
| 5/22 | 100(1)[87] | 11,424.15 | 12,852.17 | Yes | 5/26 | 1009[88] | 11,424.15 | 12,852.17 |
| 5/31 | 100(2)[89] | 34,250.00 | 38,531.25 | Yes | 6/1 | 1010[90] | 34,250 | 38,531.25 |
| 6/12 | 105[91] | 7,250.00 | 8,156.25 | Yes | 6/15 | 1012[92] | 7,250 | 8,156.25 |
| 6/18 | 106[93] | 11,000.00 | 12,375.00 | Yes | 6/21 | 1014[94] | 11,000 | 12,375.00 |
| 7/8 | 107[95] | 38,400 | 43,200.00 | Yes | 7/10 | 116[96] | 38,400 | 43,200 |
| 7/29 | 108[97] | 9,749.00 | 10,967.63 | Yes | 7/29 | 1015[98] | 9,749 | 10,967.63 |
| 8/6 | 109[99] | 18,110.00 | 20,373.75 | Yes | 8/10 | 1017[100] | 18,110 | 20,373.75 |
| 8/13 | 110[101] | 3,000 | 3,375 | Yes | 8/17 | 121[102] | 3,000 | 3,375 |
| 9/14 | 103(2)[103] | 3,000 | 3,375 | No | N/A | N/A | 0 | 0 |

---

[83] Ptfs.' Exh. T.

[84] Ptfs.' Exh. LLLL.

[85] Ptfs.' Exh. V.

[86] Ptfs.' Exh. MMMM.

[87] Ptfs.' Exh. U.

[88] Ptfs.' Exh. NNNN.

[89] Ptfs.' Exh. W.

[90] Ptfs.' Exh. OOOO.

[91] Ptfs.' Exh. X.

[92] Ptfs.' Exh. PPPP.

[93] Ptfs.' Exh. Y.

[94] Ptfs.' Exh. RRRR.

[95] Ptfs.' Exh. Z.

[96] Ptfs.' Exh. SSSS.

[97] Ptfs.' Exh. AA.

[98] Ptfs.' Exh. TTTT.

[99] Ptfs.' Exh. BB.

[100] Ptfs.' Exh. UUUU.

[101] Ptfs.' Exh. CC.

[102] Ptfs.' Exh. YYYY, at p. 5–6.

[103] Ptfs.' Exh. DD.

Based on the foregoing, French paid Wilkinson $154,420.60[104] for work performed on the Barndominium.  French relied on Wilkinson to provide her with accurate invoices and paid them dutifully and expediently.  As to the sole unpaid "finish out" invoice from September 14, 2020,"[105] French refused to pay based on her belief that the "finish out" should have included the yet-incomplete dirt work.  Per Wilkinson, this invoice contemplated finishing out items unrelated to the dirt work, such as the installation of shower and tub bases.  French's nonpayment of the September 14 invoice was deliberate and without justification.

Additionally, French and Mickels made two payments directly to subcontractors.  First, French and Mickels sent check # 1013, a $4,006.00 check, to Rustin Benke for fencing and gate-installation.[106]  Second, they made a $6,765.00 payment to Custom Concrete for concrete floor staining services.[107]  French and Mickels unilaterally made these payments to the subcontractors outside the purview of the French-Wilkinson Barndominium Contract.

Wilkinson paid contractors via checks drawing funds from the "Rockin A" bank account.  Each check was denoted as being for "carol" or "carol's job."  The following chart tabulates these expenditures:

| Date | Check # | Subcontractor | Service | Total ($) |
|------|---------|---------------|---------|-----------|
| 4/3 | 1144[108] | Rustin Benke | Pad | 5,000 |
| 5/6 | 1155[109] | Travis Robertson, TX Plumbing | Plumbing Rough-in | 2,950.00 |
| 5/22 | 1157[110] | Abel Gonzalez | Concrete work; pads, forms, footings. | 11,100.00 |
| 5/29 | 1158[111] | Associated Well Services | Drilled the well | 11,424.15 |
| 5/29 | 1159[112] | Andrew Haney (AFC) | Lumber and Framing | 6,500.00 |
| 6/6 | 1162 | Tommy Ruderer | Steel Framing | 27,750.00 |
| 6/12 | 1163 | Andrew Haney (AFC) | Lumber, Framing, Doors, etc. | 5,000.00 |
| 6/19 | 1165 | Andrew Haney (AFC) | Uncertain[113] | 9,000.00 |
| 7/8 | 1167 | Tommy Ruderer | Metalwork | 34,400.00 |

| 7/29 | 1171 | Ellibee HVAC | HVAC work | 6,800.00 |
| 8/7 | 1172 | Andrew Haney (AFC) | Drywall | 6,500.00[114] |
| 8/11 | 1173 | Travis Robertson, TX Plumbing | Stack out, water lines and drain installation | 4,210.00 |
| 8/11 | 1175 | Xtreme Electric | Electrical | 5,650.00 |
| 8/11 | 1176 | Total Concept Insulation | Spray Foam the Barndominium Apartment only | 5,900.00 |
| 8/21 | 1178[115] | Andrew Haney (AFC) | Drywall, Tape/Float/Texture | 5,500.00 |

In comparing the invoices sent by Wilkinson to French, the checks sent by French to Wilkinson, and the subsequent checks sent by Wilkinson to the subcontractors, the Court finds that Wilkinson overbilled French two times for a total of $6,378.45.

First, Wilkinson overbilled French $2,387.45, the difference between $13,487.45 and $11,100.00, for Abel Gamez's concrete work. On May 7, 2020, Wilkinson sent French invoice number 103[116], requesting $15,173.38 for "Concrete."[117] Invoice 103 had two billed work items plus the 12.5% GC fee: $9,500.00 for "1200SF Foundation," $3,987.45 for "Curb Footing," for a

---

[104] This figure is slightly different than the amount listed on the Project Overview. *See* Ptfs.' Exh. JJJJ; Def.'s Exh. 7.

[105] Ptfs.' Exh. DD.

[106] Ptfs.' Exh. QQQQ.

[107] *See* Ptfs.' Exh. WWWW (invoice for Custom Concrete Staining).

[108] Ptfs.' Exh. R; Def.'s Exh. 5.

[109] *Id.*

[110] *Id.*

[111] *Id.*

[112] *Id.*

[113] Mr. Haney testified that there was no invoice corresponding to check number 1165.

[114] This check was for $13,000.00, but Wilkinson's uncontroverted testimony was that half of check # 1172, $6,500.00, went towards the Barndominium project.

[115] At trial, the parties stipulated that this was the last check Wilkinson sent to Mr. Haney.

[116] Invoice Number 103 was also used for another invoice, sent on September 14, 2020.

[117] See Ptfs.' Exh. V; Def.'s Exh 4.

36

subtotal of $13,487.45.[118]  As requested, French sent a $15,173.38 ($13,487.45 + the 12.5%

general contractor fee) check to Rockin A, on May 8, 2020.[119]  On May 22, 2020, Wilkinson sent

Abel Gamez, the concrete contractor, check number 1157, an $11,100.00 check for "Carrol."[120]

Wilkinson acknowledged that he charged French $13,487.45 for concrete work and paid concrete

contractor Abel Gamez $11,100.00 for that same work, but he failed to explain the $2,387.45

discrepancy.

Second, Wilkinson overbilled French $4,000.00, the difference between $38,400.00 and

$34,400.00, for Tommy Ruderer's metal work and trailer covers.  On July 8, 2020, Wilkinson sent

French invoice number 107, a $43,200.00 invoice for "Metal Work."[121]  Invoice number 107 had

a subtotal of $38,400.00, calculated as the sum of the following two billed items: materials and

labor, at $31,750.00, and "Trailer Cover," at $6,650.00.[122]  The $43,200.00 total resulted from

adding the subtotal with the GC Fee.[123]  On July 10, 2020, French sent Rockin A check number

116, a $43,200.00 check with a blank "for" section.[124]  Wilkinson subsequently paid Tommy

Ruderer $34,400.00 for the metal work and trailer cover on July 10, 2020 via check number

1167.[125]  Wilkinson could neither explain nor account for the discrepancy between the $38,400.00

French paid to Wilkinson and the $34,400.00 Wilkinson paid to Tommy Ruderer.

---

[118] *Id.*

[119] Ptfs.' Exh. MMMM.

[120] Ptfs.' Exh. XXXXXX.

[121] Ptfs.' Exh. Z; Def.'s Exh. 4.

[122] *Id.*

[123] *Id.*

[124] Ptfs.' Exh. SSSS.

[125] Ptfs.' Exh. R, at p. 18.

Third, Wilkinson billed French $3,987.45 for "curb footings" which were not installed.  On May 7, 2020, Wilkinson sent French invoice number 103, labeled "Concrete," for  $15,173.38.[126] This invoice had two billed work items: "1200SF Foundation," at $9,500.00, and "Curb Footing," at $3,987.45.[127]   The invoice total of $15,173.38 is the sum of the two billed items and the GC fee.[128]  On May 8, 2020, French paid Wilkinson $15,173.38 via check number 1008.[129]  The Project Overview listed "concrete" costs of $15,173.38 and represented that work on the concrete was complete.[130]

In summary, Wilkinson overbilled French $6,378.45 for work that was done and billed $3,987.45 for work that was not done.

### (b.)    Wilkinson's Overbilling was Inadvertent, but Wilkinson's Charging for Curb Footings was Not

While Wilkinson did overbill French $6,378.45, Wilkinson did so inadvertently.   As discussed earlier, COVID-19 impacted all aspects of commercial life, including the residential construction industry.  Wilkinson and his subcontractors faced rising costs and delays.  At times, Wilkinson declined to pass these rising costs to French.  Other times, Wilkinson recouped these costs from French's checks.

For example, on June 18, 2020, Wilkinson sent French invoice number 106, a $12,375.00 invoice for "Framing."[131]  Invoice number 106 had a subtotal of $11,000.00, calculated as the sum of the following two billed items: lumber, at $4,000.00, and labor, at $7,000.00.[132]  The $12,375.00

---

[126] Ptfs. Exh. V.

[127] *Id.*

[128] *Id.*

[129] Ptfs.' Exh. MMMM.

[130] Ptfs.' Exh. JJJJ; Def.'s Exh. 7.

[131] Ptfs.' Exh. Y; Def.'s Exh. 4.

[132] *Id.*

total resulted from adding the subtotal with the GC Fee.[133]  On June 21, 2020, French sent Rockin A check number 1014, a $12,375.00 check with a blank "for" section.[134]   Subsequent to Wilkinson's receipt of check number 1014 from French, Wilkinson sent Andrew Haney (AFC) a $9,000.00 check, check number 1165, for "carol" on June 19, 2020.[135]   At trial, Wilkinson explained the $2,000.00 difference between the amount paid by French and the amount paid to Andrew Haney (AFC):  Wilkinson previously, using his own money, gave Andrew Haney (AFC) $2,000.00 on June 5, 2020, to help mitigate COVID-19-related issues affecting Andrew Haney (AFC)'s business,[136] and Wilkinson recouped that $2,000.00 from check number 106.

Wilkinson's billing practices were unsophisticated.  He favored handshake agreements and friendly relations with his subcontractors.  Though he overbilled French, he did not do so with any nefarious purpose.  Given the opportunity, Wilkinson would have completed the Barndominium project within the $198,562.50 budget.

Wilkinson's billing French $3,987.45 for footings, however, was not inadvertent.  Invoice number 103 clearly stated that barn "Curb Footings" were a billed item.[137]  As discussed above, there were no footings under the barn.  Though French failed to show that curb footings were required to ensure the barn's foundation was structurally sound, she was nevertheless billed for them.  Wilkinson, as the general contractor who transacted directly with French, should have known that curb footings were not installed.  By billing for an item which was not included,

---

[133] *Id.*

[134] Ptfs.' Exh. RRRR.

[135] Ptfs.' Exh. R, at p. 18.

[136] Check number 1161.  Ptfs.' Exh. R, at p. 17.

[137] Ptfs.' Exh. V.

Wilkinson necessarily misrepresented that footings were included. French relied on that representation and accordingly paid $3,987.45 despite the curb footing not being installed.

### (3.)    *Litigation and the Bankruptcy*

On October 2, 2020, a few weeks after Wilkinson stopped construction on the Barndominium, French engaged an attorney to send Wilkinson a demand letter seeking $215,000.00.[138] Wilkinson subsequently filed for chapter 7 bankruptcy on May 11, 2021.[139] Wilkinson listed a debt of unknown amount owed to French on his initial schedules, but he did not list any claim against French.[140] Wilkinson attended his section 341 meeting on June 9, 2021,[141] and a Rule 2004 examination on July 29, 2021.[142]

French sued Wilkinson in August of 2021.[143] Her live complaint, the Amended Complaint, was filed on September 16, 2021.[144] On April 7, 2022, Wilkinson filed an amended schedule B to add a claim against French for $2,604.17.[145]

## *DISCUSSION*

The federal bankruptcy system is designed to provide the honest but unfortunate debtor with the opportunity to obtain a fresh financial start.[146] As explained by the Supreme Court, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in

---

[138] PTO., Ch. B, at ¶ d.

[139] PTO., Ch. B, at ¶ f.

[140] *See* Bankruptcy Dkt. No. 1; PTO, Ch. B, at ¶¶ h & i.

[141] PTO., Ch. B, at ¶ j.

[142] PTO., Ch. B, at ¶ l.

[143] PTO., Ch. B, at ¶ m.

[144] PTO., Ch. B, at ¶ m.

[145] PTO., Ch. B, at ¶ s.

[146] *Marrama v. Citizens Bank of Massachusetts*, 549 U.S. 365, 367 (2007).

life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'"[147]

## A.     Determination of a Debt Subject to Nondischargeability Claims Under Bankruptcy Code Section 523

Section 523 of the Bankruptcy Code excepts from an individual chapter 7 debtor's bankruptcy discharge certain kinds of "debts."[148]  The Bankruptcy Code defines "debt" as "liability on a claim"[149] and expansively defines "claim" as meaning "a right to payment, whether or not such right has been reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured" or a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."[150]  With that framework in mind, the question here becomes whether Wilkinson has any liability on a claim alleged by French and Mickels in their Amended Complaint.  French and Mickels bear the burden of proof on such issues.

French alleges essentially one type of claim predicated on one or more of the following legal bases: (1) the Texas Deceptive Trade Practices Act ("**DTPA**") violations, (2) breach of contract, (3) negligence, (4) breach of express and/or implied warranties, (5) common law fraud, (6) fraudulent inducement, and (7) conversion.  Mickels alleges a claim predicated upon either Texas DTPA violations or common law fraud.

---

[147] *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934)).

[148] *See* 11 U.S.C. 523(a) ("A discharge under section 727 . . . of this title does not discharge an individual debtor from any *debt*" of a kind delineated within the subsections of § 523(a)) (emphasis added).

[149] *See* 11 U.S.C. 101(12).

[150] *See* 11 U.S.C. 101(5).

As an affirmative defense, Wilkinson alleges that, supposing he is liable on a claim to either French or Mickels, their damages should be reduced due to their failure to mitigate. Wilkinson further alleges a counterclaim for breach of contract for damages not to exceed $2,604.17.

In turn, the Court will address each of the Plaintiff's claims, beginning with French and Mickels' DTPA claim before turning to Wilkinson's affirmative defense and counterclaim.

### (1.)    *Violation of the Texas Deceptive Trade Practices Act*

French and Mickels contend that Wilkinson violated the Texas Deceptive Trade Practices Act. The DTPA's purpose is to protect consumers from "false, misleading, and deceptive business practices, unconscionable actions and breaches of warranty," and it is liberally construed to advance that purpose.[151] Since DTPA remedies "are in addition to other . . . remedies provided for in other law," DTPA claimants are not entitled to multiple recoveries for the same act.[152]

A breach of contract claim—that is, the failure to perform under a contract—is not actionable under the DTPA.[153]

To mount a successful DTPA claim against Wilkinson, French and Mickels must establish that (i) they were consumers; (ii) Wilkinson can be sued under the DTPA; (iii) Wilkinson either (a) committed at least one wrongful act from those enumerated in § 17.46(b) of the Texas Business & Commerce Code, (b) breached an express or implied warranty, or (c) engaged in an unconscionable action; and (iv) Wilkinson's actions were the producing cause of French's and

---

[151] *Smith v. Baldwin*, 611 S.W.2d 611, 614 (Tex. 1980).

[152] Tex. Bus. & Com. Code § 17.43.

[153] *Helms v. Sw. Bell Tel. Co.*, 794 F.2d 188, 191–92, 5th Cir. 1986) (citations omitted).

Mickels's damages.[154]   Remedies for DTPA violations include compensatory damages, mental anguish damages, and, for knowing or intentional violations, treble damages.[155]

### (a.)  French is a DTPA "consumer," whereas Mickels is not

Under the DTPA, a statutory "consumer" is someone "who seeks or acquires by purchase . . . any goods or services".[156]   Texas courts apply the *Melody Home* two-part test to determine whether an individual has DTPA consumer status. First, the court determines "whether the party acquired goods or services by purchase or lease," and second, whether "the goods or services purchased or leased form the basis of the complaint."[157]   An individual need not be a direct purchaser of a good or service to qualify as a consumer; rather, consumer status depends on one's "relationship to the transaction."[158]   Whether someone is a consumer for DTPA purposes is a question of law.[159]   But if a factual predicate to consumer status is in dispute, then that disputed factual predicate is submitted to a factfinder's determination.[160]

Individuals utilizing construction services to build a homestead are DTPA consumers.[161] Additionally where the plaintiff is not a direct purchaser, courts will recognize DTPA consumer status if "the transaction was specifically required by or intended to benefit the plaintiff and the good or service" was in fact rendered to benefit the plaintiff.[162]   For example, in *Kennedy*, a

---

[154] Tex. Bus. & Com. Code §§ 17.41–17.63; *Armstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex 1996).

[155] Tex. Bus. & Com. Code § 17.50(b)(1).

[156] Tex. Bus. & Com. Code § 17.45(b)(4).

[157] *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349 (Tex. 1987).

[158] *Birchfield v. Texarkana Mem. Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987).

[159] *Fed. Deposit. Ins. Corp. v. Munn*, 804 F.2d 860, 863 (5th Cir. 1986) (citations omitted).

[160] *Id.*

[161] *Woods v. Littleton*, 554 S.W.2d 662, 665–68 (Tex. 1977).

[162] *See Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 401 (Tex. App. 2000) (citing *Arthur Anderson & Co. v. Perry Equip. Corp.*, 945 S.W.2d, 812, 815 (Tex. 1997)).

beneficiary to an employer-purchased group life insurance company sued the insurer on a DTPA theory.[163]  The Texas Supreme Court held that the plaintiff, despite not being a direct purchaser, was nevertheless a DTPA consumer because his employer specifically intended its purchase of life insurance to benefit the plaintiff.[164]  By contrast, courts have declined to extend consumer status to third parties absent evidence that the transaction was specifically entered into to benefit the third party.[165]

French, as an individual utilizing construction services to build a homestead, is a consumer under the DTPA.[166]

Mickels, by contrast, is not a DTPA consumer.  There is no dispute that Mickels did not negotiate for, enter into a contract to build, or even pay for any part of the Barndominium project. Mickels also failed to establish his status as an intended beneficiary.  And unlike the health insurance in *Kennedy*, the French-Wilkinson Barndominium construction agreement did not contemplate, at the time in which it was entered, a benefit to Mickels.  Therefore, because Mickels was neither a direct purchaser nor an intended beneficiary of the Barndominium, Mickels is not a DTPA consumer.

Accordingly, Mickels cannot maintain a DTPA action, whereas French may.

---

[163] *Kennedy v. Sale*, 689 S.W.2d 890, 892 (Tex. 1985).

[164] *Id.*

[165] *See Lukasik*, 21 S.W.3d at 402.

[166] *See Woods v. Littleton*, 554 S.W.2d 662, 665–68 (Tex. 1977) (holding that purchasers of home construction services are DTPA consumers).

### (b.)    Wilkinson Can Be Sued Under the DTPA

Further, given the DTPA's broad definition of "person" incudes "an individual, . . . corporation, or other group," Wilkinson and Rockin A assuredly qualify as persons who could be sued under the DTPA.[167]

### (c.)    Wilkinson either (a) committed at least one wrongful act from those enumerated in § 17.46(b) of the Texas Business & Commerce code, (b) breached an express or implied warranty, or (c) engaged in an unconscionable action

Turning to the allegedly "false, misleading, or deceptive acts and practices," French specifically contends that Wilkinson (i.) misrepresented his construction experience,[168] misrepresented the quality of the work performed,[169] and represented that work that had not been performed was performed[170]; (ii.) failed to disclose material information for the purpose of inducing French to enter into the Barndominium contract[171]; breached (iii.) express or (iv.) implied warranties[172]; and (v.) committed one or more unconscionable acts.[173] Additionally, French contends that (vi.) Wilkinson's (uncontested) failures to provide either a disclosure statement[174] or a list of subcontractors[175] were false, misleading, or deceptive acts.

---

[167] Tex. Bus. & Com. Code § 17.45(3).

[168] *Id.* at § 17.46(5); *see* Adversary Docket No. 4, at ¶ 54.

[169] *Id.* at § 17.46(7); *see* Adversary Docket No. 4, at ¶ 54.

[170] *Id.* at § 17.46(22); *see* Adversary Docket No. 4, at ¶ 54.

[171] *Id.* at § 17.46(24); *see* Adversary Docket No. 4, at ¶ 54.

[172] Tex. Bus. & Com. Code § 17.50(a)(2).

[173] Tex. Bus. & Com. Code § 17.50(a)(3).

[174] Tex. Prop. Code § 53.255; Adversary Docket No. 4, at ¶ 55.

[175] Tex. Prop. Code § 53.256; Adversary Docket No. 4, at ¶ 55.

### (i.)    *Misrepresentations*

Under the DTPA, consumers need only show that a false misrepresentation was made, and that specific false misrepresentation produced the consumers' damages.[176]   Accordingly, there is no intent element with respect to a DTPA misrepresentation claim.[177]   Nor must the claimant prove reliance on the misrepresentation.[178]   Whether a statement constitutes a DTPA misrepresentation is a question of law.[179]

Here, French is entitled to recover on her DTPA misrepresentation claim concerning Wilkinson's bill for unperformed work.

French alleges that Wilkinson "intentionally misrepresented material facts and qualifications when soliciting" the Barndominium project.[180]   Wilkinson did not misrepresent his construction background; he told French that he had experience building barndominiums and had in fact built barndominiums.   Indeed, French first met Wilkinson while Wilkinson was renovating French's friend Kim's barndominium.   She hired Wilkinson because she was impressed with his work, of which she had first-hand experience.

French also alleges that Wilkinson "falsely represent[ed] his qualifications to prepare plans for the construction and by stating he would prepare such plans."[181]   The trial testimony revealed that Wilkinson and French discussed using the services of a professional draftsman, that Wilkinson discussed with French the cost implications of hiring a professional draftsman, and that French did not press Wilkinson during the relevant time period to use a professional draftsman.   Wilkinson

---

[176] *See Miller v. Keyser*, 90 S.W.3d 712, 716 (Tex. 2002) (citations omitted).

[177] *Id.*

[178] *Weitzel v. Barnes*, 691 S.W.2d, 598, 600 (Tex. 1985).

[179] *Continental Dredging, Inc. v. De-Kaizered, Inc.*, 120 S.W. 3d 380, 389 (Tex, App.–Texarkana 2003).

[180] PTO, Ch. B, at ¶ www.

[181] PTO, Ch. B, at ¶ k.

neither represented that he is a professional draftsman nor that he had the software to produce a computer-generated plan.  Evidence at trial also confirmed that French received the handwritten plans, and she did not raise any concerns with respect to those plans.

French also alleges that Wilkinson misrepresented the quality of the Barndominium's construction work.[182]  This claim is overruled.  Wilkinson did not represent that the Barndominium was complete, and multiple construction steps, including finish out and the final walkthrough, were still outstanding.  French's evidence of the defects, by in large, is speculative and conclusory.  Even in instances where the construction was deficient, such as the too-small safe room, Wilkinson never represented that the safe room was complete and ready to be utilized.

Wilkinson did, however, misrepresent that the Barndominium had curb footings, and billed French for work that was not done.  Accordingly, the amount paid by French for the curb footings $3,987.45, is recoverable as damages arising from a misrepresentation,

Accordingly, except for the $3,987.45 in damages arising from the uninstalled, but paid for curb footings, French's DTPA misrepresentation claims are denied.

### (ii.)    *Failure to Disclose Material Information*

French alleges that Wilkinson violated the DTPA by failing "to disclose material information concerning . . . services" with the intent to induce French into the Barndominium contract.[183]  In essence, French claims that, had she known that Wilkinson lacked the skill to build the Barndominium, she would not have entered into the Barndominium contract.

"To prove a DTPA action for failure to disclose information, the plaintiff must show (1) a failure to disclose, (2) which was known at the time of the transaction, (3) which was intended to

---

[182] PTO, Ch. B, at ¶¶ aaa & hhhh.

[183] PTO, Ch. B, at ¶ iiii.

induce the plaintiff into a transaction, and (4) that the plaintiff otherwise would not have entered the transaction if the information had been disclosed."[184]   The undisclosed information must be material and known by the defendant.[185]

Here, French asserts that Wilkinson failed to disclose that he did not intend to do the work which he had agreed to do.  Primarily, French alleges that Wilkinson failed to install the September Driveway, including failing to perform the dirt work, to install the road base, and to install culverts. Wilkinson adequately explained why he declined to do this work per French's chosen timetable: installing the September Driveway before finalizing construction on the Barndominium structure would expose the September Driveway to damage vis-à-vis subcontractors driving heavy machinery on the driveway. The Barndominium project was not completed, and Wilkinson was not given the opportunity to install the September Driveway at the time he determined, in his discretion, to be most appropriate.   Consequently, French's DTPA failure to disclose claim is denied.

### (iii.)    Breach of Express Warranties

French also alleges that Wilkinson breached an express warranty.[186]   Specifically, French alleges that Wilkinson "expressly and/or impliedly warranted that he would properly perform all required work and repairs on the construction of the Barndominium in accordance with the generally accepted practices in the residential construction industry and any codes and regulations governing its work."[187]

---

[184] *Mize v. BMW of N. Am., LLC.*, 2020 WL 1526909, at *8 (N.D. Tex, March 31, 2020) (citations omitted).

[185] *Id.*

[186] *See* PTO, at Ch. B at ¶ jjj.

[187] Amended Complaint, at ¶ 65.

An express warranty arises when a "seller makes an affirmation of fact or a promise to the purchaser that relates to the sale and warrants a conformity to the affirmation as promised."[188]  While breach of express warranty claims are linked to breach of contract claims, they are distinct:  breach of contract claims are available when the seller fails to deliver the subject matter of the contract to the buyer, whereas breach of warranty claims are available when the subject matter of the contract is faulty.[189]

By way of example, in *Southwestern Bell Telephone*, the Texas Supreme Court held delivering an incomplete package of advertising services to a customer constituted breach of an express warranty.[190]  In that case, upon hearing the plaintiff's trepidation over entering into an advertising contract, the defendant's agent "assured [the plaintiff] that there would be no errors, that [the defendant's agent] would make sure the ad was right, that the ad would be published, and that it would draw customers."[191]  The court held that the defendant's agent's statements created an express warranty that the advertising services would be performed to the represented standard.[192]

For French to recover on her breach of an express warranty claim, she must establish: "(1) an express affirmation of fact or promise by the seller relating to the [services]; (2) that such affirmation of fact or promise became part of the basis of the bargain; that [she] relied upon said affirmation of fact or promise; (3) that the [services] failed to comply with the affirmation of fact

---

[188] *Head v. U.S. Inspect DFW, Inc.*, 159 S.W.3d 731, 747 (Tex. App.—Fort Worth, 2005)

[189] *FDP Corp. v. Southwestern Bell Telephone Co.*, 749 S.W.2d 569, 576 (Tex App.—Houston [1st Dist. 1988]), *rev'd in part on other grounds*, 811 S.W.2d 572 (Tex. 1991).

[190] *Id.*

[191] *Id.* at 570.

[192] *See Southwestern Bell*, 811 S.W.2d at 576.

or promise; (4) that [French] was injured by such failure of the [service] to comply with the express warranty; and (5) that such failure was the proximate cause of [French's] injury."[193]

Statements identifying the services to be performed do not create an express warranty. For example, in *Staton Holdings, Inc. v. Tatum, L.L.C.*, the court held that "[t]he mere identification what services are to be performed" does not establish an express warranty as to the quality or standard of those services.[194] Indeed, providing a warranty cause of action to remedy a failure to adhere to one's express obligations under a contract blurs "the distinction between contract and express warranty."[195]

Moreover, express warranties are explicit and specific. For example, in *All Metals Fabricating*, the parties executed a contract which contained a term stating the following: "The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new, . . . that the Work will be free from defects, . . . and that the Work will conform to the requirements of the Contract Documents[.]"[196] The court found that this constituted an express warranty.[197]

Here, Wilkinson's statements to French did not establish an express warranty. French alleges that Wilkinson "expressly warranted" that he possessed the experience and skill to build the Barndominium; however, French presented no evidence that Wilkinson made any representations of fact that went beyond identifying the services to be performed under the Barndominium contract. Unlike the promises in *All Metals Fabricating*, Wilkinson's statements

---

[193] *Roubein v. Marino Home Builders, Inc.*, 2002 WL 1765579, at *4 (Tex App.—Corpus Christi August 1, 2002, pet. denied) (internal quotations omitted).

[194] *Staton Holdings, Inc. v. Tatum, L.L.C.*, 2014 WL 2583668, at *3 (Tex. App.—Dallas, June 10, 2014, no pet.).

[195] *Id.*

[196] *All Metals Fabricating, Inc. v. Foster General Contracting, Inc.*, 338 S.W.3d 615, 624 (Tex. App.—Dallas 2011, no. pet. h.).

[197] *See id.* at 625. The court ultimately remanded the case to evaluate whether the express warranty was breached.

about his experience and skill do not explicitly and specifically guarantee that the Barndominium would be of a certain quality above and beyond the contractual promise to complete the project. Therefore, because Wilkinson generally stated that his experience and skill enable him to construct the Barndominium, Wilkinson made no legally cognizable express warranty to French.

Therefore, French cannot recover on a breach-of-an-express-warranty theory.

### *(iv.)    Implied Warranties*

French alleges that Wilkinson breached implied warranties.

An implied warranty is representation or promise regarding the quality of product by a seller regarding the item's quality or suitability that it imported into the parties' contract.[198] Texas law imputes two implied warranties into contracts for the sale of a newly constructed home: the implied warranty of good workmanship and the implied warranty of habitability.[199]

The implied warranty of good workmanship is recognized in contracts for the sale and construction of a home.[200] Construction of a home is "good and workmanlike" if the quality of the construction is the quality of construction performed by a builder with "the knowledge, training, or experience necessary for the successful practice of a trade or occupation and was performed in a manner generally considered proficient by those capable of judging such work."[201]

To determine whether a builder breached the implied warranty of good workmanship, Texas courts look at the builder's conduct during the construction process.[202] Accordingly, the following have been held as breaches of the implied warranty of good workmanship: a builder

---

[198] *LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d 127, 131 (Tex. App.—Amarillo 1997, writ denied).

[199] *See Humber v. Morton*, 426 S.W.2d 554, 555 (Tex. 1968).

[200] *Id.*

[201] *Melody Home Mfg.*, 741 S.W.2d at 349.

[202] *Yost v. Jered Custom Homes*, 399 S.W.3d 653, 662 (Tex. App.—Dallas 2013, no pet.) (citing *Centex Homes v. Buecher*, 95 S.W.3d 266, 269 (Tex. 2002), *superseded by statute on other grounds as stated in Gym-N-I Playgrounds, Inc. v. Snider,* 220 S.W.3d 905, 913 n.11 (Tex. 2007)).

utilized faulty bricks in the construction of a home[203]; a contractor failed to complete work required to be performed under a contract[204]; a contractor failed to connect a sink to a drain and subsequent repairs were deficient, leading to more damage.[205]

Builders are "not required to guarantee" the results of their work, only to perform their work "in a manner considered proficient by those capable of judging" the builder's performance.[206] Sometimes, laymen can judge a builder's performance.  For example, in *Melody Home*, the court held that laymen could opine on whether "the failure to connect a washing machine drain would not be considered good and workmanlike."[207]  In other situations, expert testimony is required in determining what constitutes good workmanship within an industry.[208]  For instance, in *Spruell*, expert testimony that there was no code mandating installment of a window guard helped the court determine that a contractor's failure to install a window guard was not a violation of the implied warranty of good and workmanlike construction.[209]

Here, Wilkinson breached the implied warranty of good workmanship in the following manners: he failed to properly construct the Barndominium's saferoom; he approved the placement of the electrical breaker box in a closet; and he approved the installation of the air conditioning unit in the bathroom.  The Court heard testimony from experts that these three items were

---

[203] *Evans v. J. Stiles*, Inc., 689 S.W.2d 399, 399 (Tex. 1985) (per curiam).

[204] *Barnett v. Coppell N. Tex. Court, Ltd.*, 123 S.W.3d 804, 824 (Tex. App.—Dallas 2003, no pet.) (citing, among others, *Melody Home Mfg.*, 741 S.W.2d at 354) ("Texas courts have held that the failure to complete work required to be performed under a contract is breach of the implied warranty of 'good and workmanlike manner.'").

[205] *Melody Home Mfg.*, 741 S.W.2d at 351.

[206] *Ibarra v. Noah's Roofing & Constr.*, 657 S.W.3d 412, 421 (Tex. App—El. Paso 2022, no. pet. h.) (citing *Melody Home Mfg.*, 741 S.W.2d at 354).

[207] *Melody Home Mfg.*, 741 S.W.2d at 355.

[208] *See Spruell v. USA Gardens at Vail LeasCo, L.L.C.*, 2013 WL 362740, at *3 (Tex. App.—Fort Worth Jan. 31, 2013, pet. denied.).

[209] *See id.*

insufficient for their purposes and, in the case of the breaker box, in direct violation of relevant codes.  Despite the incomplete status of the home, Wilkinson's work on the three aforementioned items was below the basic standards discussed by the experts.

Therefore, French is entitled to DTPA damages arising from Wilkinsons breach of the implied warranty of good and workmanlike construction.

Turning to the implied warranty of habitability, in contracts for the sale and construction of new homes, a homebuilder warrants that the home is "safe, sanitary, and otherwise fit for human habitation."[210]  Unlike the warranty of good workmanship, this warranty does not focus on the builder's conduct; rather, it focuses on the completed structure itself.[211]  As such, a breach of the implied warranty of habitability represents a form of strict liability since the completed structure's quality, not the manner of performance, governs fidelity to the implied warranty of habitability.[212]  The implied warranty of habitability does not protect home buyers from mere substandard construction.[213]

Here, the Barndominium lacks electricity, running water, and a working HVAC system, among other deficiencies.  It is uninhabitable; however, it is uninhabitable because it is incomplete.  Everyone involved in this litigation agrees that Wilkinson did not finish constructing the Barndominium and that, since September 2020, French hired no one to complete the Barndominium.  Since the implied warranty of habitability only applies to completed homes, the implied warranty does not apply here.

Therefore, French's implied warranty of habitability DTPA claim is denied.

---

[210] *Centex Homes v. Buecher*, 95 S.W.3d 266, 273 (Tex. 2002)

[211] *Id.*

[212] *Id.*

[213] *Id.* at 272.

### (v.)   *One or More Unconscionable Acts*

French further alleges that Wilkinson committed "an unconscionable action or course of action."[214]

Under the DTPA, "an act or practice which, to the consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree" constitutes an unconscionable act.[215]  A practice is "grossly" unfair when it results in "glaringly noticeable, flagrant, complete and unmitigated" unfairness. [216]  In the context of real property transactions, unconscionability results when one party takes advantage of another who is less informed and sophisticated.[217]

Here, French is no less informed or sophisticated than Wilkinson.  French was in constant contact with one of her construction experts, Mickels, throughout the project.  She—and Mickels—visited with Wilkinson multiple times throughout construction.  French did not raise a single issue related to the Barndominium's construction until September, when she demanded Wilkinson build the September Driveway.  Quite simply, there is no unfairness here, much less "glaringly noticeable" unfairness.  Accordingly, French's DTPA unconscionability claim is denied.

### (vi.)   *Wilkinson's Violations of the Texas Property Code Do Not Give Rise to DTPA Liability*

With respect to French's allegation that Wilkinson's failure to make disclosures under sections 53.255 and 53.256 of the Texas Property Code constitute false, deceptive, or misleading acts for DTPA purposes, the Court first notes that in the event of a conflict between the DTPA and

---

[214] PTO, Ch. B, at ¶ llll.

[215] Tex. Bus. Com. Code § 17.45(5).

[216] *Chastain v. Koonce*, 700 S.W.2d 579, 583–84 (Tex. 1985).

[217] *Insurance Co. of N. Am. V. Morris*, 981 S.W.2d 667, 667 (Tex. 1998).

the Texas Property Code, the Texas Property Code controls.[218]  Further, Chapter 53 of the Texas

Property Code addresses "Mechanic's, Contractor's, or Materialman's Liens,"[219]  and Subchapter

K, which contains sections 53.255 and 53.256, addresses the requirements "to perfect a lien that

arises from a claim resulting from a residential construction project."[220]

Pursuant to section 53.255, contractors are required, before construction commences, to

provide consumers with a disclosure statement informing them of their rights regarding the

construction project and any lien activity on their property.[221]  Failure to provide this disclosure

statement will not invalidate otherwise valid contractor's and materialman's liens.[222]  Claims

relating to a contractor's failure to provide the required disclosure statement do not raise DTPA

issues.[223]

Similarly, pursuant to section 53.256, residential contractors are required to provide

consumers with a list of subcontractors and suppliers.[224]  This list must be in writing and must be

updated throughout the project.[225]  Failure to comply with section 53.256 does not invalidate an

otherwise enforceable contractor's or materialman's lien.[226]

---

[218] *See* Tex. Bus. & Com. Code § 17.44(b).

[219] *See* Tex. Prop. Code Ch. 53.

[220] *See* Tex. Prop. Code § 53.251 ("A person must comply with this subchapter in addition to the other applicable provisions of this chapter to perfect a lien that arises from a claim resulting from a residential construction project.").

[221] *See* Tex. Prop. Code § 53.255.

[222] *See* Tex. Prop. Code § 53.255(c).

[223] *See Page v. Structural Wood Components, Inc.*, 102 S.W.3d 720 (Tex. 2003) (applying the Texas Property Code to adjudicate a dispute including, among other things, a residential construction contractor's failure to provide required disclosure statement).

[224] *See* Tex. Prop. Code § 53.256.

[225] *See* Tex. Prop. Code § 53.256(a)(2).

[226] *See* Tex. Prop. Code § 53.256(c).

55

The remedies for claims alleging violations of the Texas Property Code are limited to actual damages and lien enforcements.[227]   A violation of the Texas Property Code is actionable via a DTPA suit if the statute provides for a DTPA remedy.[228]  For example, in *Chubbs Lloyds Inc.*, the parties litigated a dispute centered, in part, on section 41.007 of the Texas Property Code, which requires a certain disclosure statement in home improvement contracts.[229]  The court held that if the required disclosure were not made, the contract is nevertheless enforceable and the DTPA—a remedy explicitly listed in section 41.007 of the Texas Property Code—was sufficient to ensure compliance with the statute.[230]

Here, Wilkinson stipulated that he failed to adhere to sections 53.255 and 53.256 of the Texas Property Code.[231]  Those sections, as discussed above, deal with lien validity.   Wilkinson alleges no lien on the Barndominium.  Further, even if this dispute centered on the validity of a lien on the Barndominium, sections 53.255 and 53.256 do not explicitly provide for a DTPA remedy.

Consequently, Wilkinson's failure to provide the disclosures as required by sections 53.255 and 53.256 of the Texas Property Code do not constitute false, deceptive, or misleading acts within the ambit of the DTPA.

---

[227] *See, e.g.*, Tex. Prop. Code § 53.251(a)-(b); *see also* Tex. Prop. Code Ann. § 27.002.

[228] *See, e.g.*, Tex. Prop. Code Ann. § 41.007(b) ([A] violation . . . is actionable in a public or private suit brought under the provisions of the Deceptive Trade Practices-Consumer Protection Act").

[229] *See Chub Lloyds Ins. Co. of Tex. v. Andrew's Restoration, Inc.*, 323 S.W.3d 564, 577 (Tex. App.—Dallas 2010), *aff'd in part, rev'd in part sub nom*, *Cruz v. Andrews Restoration, Inc.*, 364 S.W.3d 817 (Tex. 2012).

[230] *Id.* at 578.

[231] *See* PTO, at Ch. B at ¶ r.

### (vii)    French's DTPA Damages

Under the DTPA, consumers are entitled to recover, in addition to economic damages and, at the discretion of the fact finder, treble damages for knowing or intentional DTPA violations.[232]

French's DTPA damages arise from misrepresentations concerning services and a breach of the implied warranty of good and workmanlike construction.  French failed to properly plead damages with respect to individualized construction items, nor did she provide any explanation for the cost to complete the Barndominium project.  The most credible of the testifying experts, Johnny Tate, testified that the materials used in the incomplete Barndominium were worth $175,000.00. Despite this testimony, this figure does not demarcate the value of the materials on an item-by-item basis.

Consequently, the Court will utilize the amounts paid to subcontractors for certain items and assume that those items must be replaced at total cost.  The HVAC work cost $6,800.00 and the electrical work cost $5,650.00.  French failed to denote which checks went to the saferoom and therefore is not entitled to damages arising from the faulty saferoom construction.

Additionally, as discussed above, French is entitled to $3,987.45 for Wilkinson's misrepresentation regarding the installation of curb footings in the Barndominium.  French's claim for emotional damages, discussed more fulsomely below, is denied.  As the trier of fact, the award of treble damages is left to the Court's discretion.[233]   The Court determines that French is not entitled to treble damages.  Therefore, her DTPA damages are $16,437.45.

---

[232] Tex. Bus. & Com. Code § 17.50(h).

[233] *See* Tex. Bus. & Com. Code §17.506(h).

### (viii)   Attorney's Fees Under the DTPA

Successful DTPA plaintiffs are entitled to attorney's fees as part of their damages award.[234]

Absent "an actual damages recovery, a party is not entitled to an attorneys fee recovery."[235]   In

accordance with Federal Rule of Bankruptcy Procedure 7054, which adopts Federal Rule of Civil

Procedure 54(d)(2)(A)-(C), the Court will by separate order set a supplemental hearing to address

the issue of attorney's fees.

### (2.)   Breach of Contract

Under Texas law, the elements of a claim for breach of contract are: "(i) the existence of a

valid contract; (ii) performance or tendered performance by the plaintiff; (iii) breach of the contract

by the defendant; and (iv) damages sustained by the plaintiff as a result of the breach."[236]

French argues that Wilkinson committed material breach when he raised the price of the

Barndominium project from $195,350.00 to $198,562.50[237]; denied that the parties' agreement

obligated him to install wood slats on the barn, insulate the barn with spray foam, install horse

corrals and runs, and stain the concrete floors[238]; overcharged French on the project by raising the

---

[234] See Tex. Bus. & Com. Code §17.506(d)(2).

[235] Gulf States Utils. Co. v. Low, 79 S.W.3d 561, 567 (Tex. 2002).

[236] See Smith Int'l, Inc. v. Egle Group, LLC, 490 F.3d 380, 387 (5th Cir. 2007) (quoting Valero Mktg. & Supply Co. v. Kalama Int'l, LLC, 51 S.W.3d 345, 351 (Tex. App.—Houston [1st Dist.] 2001, no pet.)); USAA Tex. Lloyds Co. v. Menchaca, 545 S.W.3d 479, 501 n.21 (Tex. 2018) ("A plaintiff asserting a breach-of-contract claim must prove (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach.").

[237] See PTO, at Ch. B at ¶ zzz.

[238] See PTO, at Ch. B at ¶ p, q; see also Ptfs. Exh. JJJ, at p. 2.

price from $195,350.00 to $198,562.50[239]; submitted invoices for work that was not done;[240] and abandoned the Barndominium project by walking off the job.[241]

Wilkinson argues that French breached the contract first by refusing to pay an invoice.[242] His damages, if any, cannot exceed $2,604.17.[243]

### (a.)   The Oral Contract is Enforceable

As to the first element, whether the parties reached an agreement is a question of fact,[244] but whether an agreement is enforceable is a question of law.[245]  In Texas, a legally-enforceable contract requires (a.) an offer; (b.) an acceptance in strict compliance with the terms of the offer; (c.) mutual assent, or a "meeting of the minds"; (d.) a communication that each party has consented to the terms; and (e.) execution and delivery of the contract with the intent that it be mutually binding.[246]  To determine whether the parties have mutually assented to the contract's material terms, courts examine facts and circumstances, including like the parties' statements, conduct, or course of dealing, which the performing party knows or should know implies their assent.[247]

Oral contracts are enforceable.[248]  Enforceability depends on whether a court has sufficient information to ascertain the parties' legal obligations and liabilities, namely, the contract's

---

[239] *See* PTO, at Ch. B at ¶ uu.

[240] *See* PTO, at Ch. B at ¶ vv.

[241] *See* PTO, at Ch. A at ¶ 1.

[242] See Ptfs.' Exh. CCC.

[243] *See* Adversary Docket No. 109.

[244] *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 556 (Tex. 1972).

[245] *Pickle v. Universal Cable Holdings, Inc.*, 534 F.Supp.3d 663, 682 (N.D. Tex. 2021) (citations omitted); *see also Ruth v. Collazo Holdings, LLC*, 2021 WL 1706192, at *4 (Tex. App.—Eastland Apr. 30, 2021, no pet.).

[246] *Id.*; *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 689 (5th Cir. 2018); *Turner v. NJN Cotton Co.*, 485 S.W.3d 513, 521 (Tex. App.—Eastland 2015, pet. denied).

[247] *Id.* at 609–10*; see also Domingo v. Mitchell*, 257 S.W.3d 34, 40 (Tex. App.—Amarillo 2008, pet. denied).

[248] *See Osherow v. Dundon et al. (In re Legendary Field Exhibitions, LLC)*, Adv No. 22-05078, 2023 WL 7852657, at *6–7 (Bankr. W.D. Tex, November 13, 2023).

essential terms.[249]  For construction contracts, the essential terms are the home's design, location, material, size, and cost (or a formula to calculate the final cost).[250]

Here, the parties stipulated that they "entered into a contract" under which Wilkinson agreed to build the Barndominium.[251]  Further, their contract is enforceable:  French and Wilkinson had discussions and exchanged text messages regarding the location, size, design, materials, and cost of the Barndominium.  Further they performed under the agreement: Wilkinson worked on the Barndominium project from March through September 2020, and French paid Wilkinson at least $154,861.42 in progress payments for that work.

While neither party produced a "written contract," the Project Overview[252] sufficiently describes, in addition to the work done and work pending, the project costs and Wilkinson's 12.5% general contractor fee.[253]  Therefore, the parties' oral Barndominium construction agreement, coupled with the Project Overview, satisfy the first element of French's breach of contract claim.

### (b.)    French Failed to Fully Perform, Substantially Perform, or Tender Performance.

With respect to the second element, the plaintiff must show that it fully performed,[254] substantially performed,[255] or tendered performance of its obligations.[256]    Additionally, the

---

[249] *Lloyd Walterscheid & Walterscheid Farms, LLC v. Walterscheid*, 557 S.W.3d 245, 259 (Tex. App.—Fort Worth 2018, no pet.) (citation omitted).

[250] *SCD BLK 251 Houston LLC v. Mt. Jefferson Holdings L.L.C.*, No. 21-20396, 2022 WL 3647285, at *3-4 (5th Cir. Aug. 24, 2022) (per curiam) (not designated for publication).

[251] *See* PTO, at Ch. B at ¶ a.

[252] Ptfs.' Exh JJJJ.

[253] *See Smith v. Renz*, 840 S.W.2d 702, 707 (Tex. App. 1992) (course of dealing establishes terms of oral arrangement, including general contractor fee); *see also Tricon Energy Ltd. V. Vinmar Intern., Ltd.*, 718 F.3d 448, 455 (*citing In re Bunzl USA, Inc.*, 155 S.W.3d 202, 209 (Tex. App. 2004)) (unsigned document evidences material terms of oral agreement).

[254] *Vance v. My Apt. Steak House,* 677 S.W.2d 480, 481 (Tex. 1984).

[255] *James Constr. Grp. v. Westlake Chem. Corp.*, 650 S.W.3d 392, 405 n.14 (Tex. 2022).

[256] *See Perry v. Little*, 419 S.W.2d 198, 200–01 (Tex. 1967).

plaintiff will be excused from its obligations if the defendant materially breached,[257] repudiated its promise,[258] prevented the plaintiff's performance,[259] or waived the plaintiff's performance obligations.[260]   Absent an agreement stating otherwise, Texas law presumes that contract counterparties' reciprocal obligations are dependent "since such construction ordinarily prevents one party from having the benefit of his contract without performing his own obligation."[261]

Here, because French and Wilkinson did not agree otherwise, their obligations were dependent, and performance was due at the same time.  Since French did not pay Wilkinson's September 14 invoice,[262] French neither fully performed nor substantially performed her payment obligations.  Further, Wilkinson neither prevented French from paying the invoice nor explicitly or implicitly waived French's obligation to pay the invoice.  Thus, to maintain a breach of contract action against Wilkinson, French must show that she tendered performance or that Wilkinson materially breached or repudiated his promise to build the Barndominium.

A plaintiff tenders performance if it is ready, willing, and presently able to perform its dependent promise, and the other party is given notice of such.[263]  With respect to exchanges involving payment obligations, a "tender" is an unconditional offer to pay an owed sum of money

---

[257] *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004).

[258] *Glass v. Anderson*, 596 S.W.2d 507, 511 (Tex. 1980).

[259] *Sage St. Assocs. v. Northdale Constr. Co.*, 809 S.W.2d 775, 777 (Tex. App.—Houston [14th Dist.] 1991), *rev'd in part on other grounds*, 863 S.W.2d 438 (Tex. 1993).

[260] *Regent Int'l Hotels, Ltd. v. Las Colinas Hotels Corp.*, 704 S.W.2d 101, 103–04 (Tex.App.—Dallas 1985, no writ)

[261] *Id.*

[262] *See* Ptfs.' Exh CCC; *see also* Ptfs.' Exh DD.

[263] *Perry v. Little*, 419 S.W.2d 198, 200 (Tex. 1967).

in full.[264]  It bears repeating that an offer to make payment conditioned on anything is not a tender

of payment.[265]

A party repudiates when it, by either words or actions, declares "an *unconditional* intent

not to perform the contract according to its terms."[266]

To determine whether a breach is material, Texas courts look to the following list of

nonexclusive factors:

> (a) the extent to which the injured party will be deprived of the benefit which
> he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the
> part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will
> suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will
> cure his failure, taking account of the circumstances including any reasonable
> assurances; [and]
> (e) the extent to which the behavior of the party failing to perform or to offer
> to perform comports with standards of good faith and fair dealing.[267]

In *Light v. Thoma*, a Texas appellate court applied the above-referenced factors in a dispute

involving the construction of a home.[268]  In that case, the customers, after paying five invoices,

failed to pay the builder's sixth invoice.[269]  The customers argued the builder materially breached

the parties' home construction agreement by failing to include required information on the sixth

invoice.[270]  The lack of this information, according to the customers, prevented them from

---

[264] *See Crisp Analytical Lab, L.L.C. v. Jakalam Properties, Ltd.*, 422 S.W.3d 85, 91 (Tex. App.—Dallas 2014, pet. denied).

[265] *See id.*, at 92 (concluding that a conditional offer in the form of a liability release was not a tender of payment).

[266] *Enis v. Bank of America, N.A.*, 2012 WL 4741073, at *4 (N.D. Tex. Oct. 3, 2012).

[267] *See Light v. Thoma*, 2021 WL 2425810, at *3 (Tex. App.—Amarillo June 14, 2021, pet. denied) (per curiam) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199 (Tex. 2004) (per curiam)).

[268] *Light v. Thoma*, 2021 WL 2425810 (Tex. App.—Amarillo June 14, 2021, pet. denied) (per curiam).

[269] *Id.* at *1.

[270] *Id.*

evaluating whether defective materials were used in the home's construction.[271]  In rejecting the customer's argument, the court noted that the builder's previous five invoices, which the customers paid without any fuss, also did not include the ostensibly required information.[272]  Further, the court highlighted that the customers failed to ask for progress updates and only raised concerns about the lack of information when "animosities developed on both sides."[273]

Here, French did not unconditionally tender payment of the September 14 invoice.  Indeed, she explicitly conditioned her payment of that invoice on Wilkinson addressing French's concerns, including the "dirt work and driveway," before she would pay the latest invoice.  Accordingly, because French made Wilkinson a conditional offer to pay the September 14 invoice, French did not tender payment.

Here, too, while Wilkinson did expressly tell French that he "will not be able to continue working on [the Barndominium] project,"[274] Wilkinson conditioned his prospective failure to perform on French's continued failure to pay the September 14 invoice.  Because Wilkinson conditioned his prospective failure to perform on French's continued failure to make a required payment, Wilkinson did not repudiate the Barndominium agreement.

Accordingly, because French did not tender payment and Wilkinson did not unconditionally repudiate, French can only maintain a breach of contract action if Wilkinson materially breached the contract first.

---

[271] *Id.*

[272] *Id.* at *3.

[273] *Id.*

[274] *See* Ptfs.' Exh CCC.

63

### (c.) Wilkinson Was Not Given The Opportunity to Substantially Perform, and French Materially Breached

The doctrine of substantial performance governs construction contracts in Texas. A home-building contractor substantially performs when they "in good faith intended to comply with the contract," and "the defects are not pervasive, do not constitute a deviation from the general plan contemplated for the work, and are not so essential that the object of the parties in making the contract and its purpose cannot, without difficulty, be accomplished by remedying them."[275]

A contractor does not have "license to install whatever is, in his judgment, 'just as good.'"[276] Substantial performance is determined by weighing the purpose to be served, the plaintiff's desire for gratification, the defendant's excuse for deviating from strict compliance, and the cruelty of enforcing strict compliance or compelling the plaintiff to receive something less than it bargained for.[277] If curing errors will damage the structure as a whole, the defendant did not substantially comply.[278]

By way of example, in *West Texas Landscape, Inc. v. Meneses*, the court held that a customer's nonpayment to a builder was excused because the builder continued to work and construction was so deficient as to constitute a material breach.[279] In that case, the builder agreed to construct a pool and its accompanying surroundings.[280] The customer failed to make a progress payment and the builder nevertheless continued to work.[281] Subsequently, the customer also failed

---

[275] *Turer v. Ewing*, 625 S.W.3d 510, 518 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (quoting *Atkinson v. Jackson Bros.*, 270 S.W. 848, 850 (Tex. Comm'n App. 1925, holding approved)).

[276] *O. W. Grun Roofing & Constr. Co. v. Cope*, 529 S.W.2d 258, 261 (Tex. Civ. App.—San Antonio 1975, no writ, h).

[277] *Id.* at 261–62.

[278] *Atkinson*, 270 S.W., at 851.

[279] *West Texas Landscape, Inc d/b/a Taylor Landscape Co. v. Mark Meneses*, 2021 WL 4201602, at *9 (Tex. App.—Eastland Sept. 16, 2021, no pet.).

[280] *Id.* at *1.

[281] *Id.*

to make the final payment and the builder sued for damages.[282]  At trial, the customer's expert testified to various defects, including incomplete tile and plaster work, an inoperable fire pit, unlevel pavers which caused flooding, and loose rocks.[283]  The court held that the customer's nonpayment was excused because there was credible evidence that the pool's deficiencies hindered the customer's use and enjoyment of the pool.[284]

Here, French claims that even before Wilkinson completed the project, he failed to substantially perform and thus was in material breach.  She asserts a host of defects that render the incomplete Barndominium uninhabitable and unfit for its intended purpose.

At trial, Wilkinson testified that French's refusal to pay the September 14 invoice stemmed from Wilkinson's failure to complete the dirt work for the Barndominium's driveway.  By that point, French had paid all prior invoices without attempting to direct Wilkinson's construction and was living on the property in a trailer.  Simply put, the parties' arrangement did not contemplate French's involvement in the order and cadence of construction.  Additionally, Wilkinson did not arbitrarily fail to complete the dirt work on September 14.  Rather, applying his experience, Wilkinson determined that the dirt work for the driveway should wait until the end of the project because, otherwise, the dirt work would be ruined by the vehicles and machines entering and exiting the Barndominium jobsite.  Accordingly, Wilkinson did not fail to substantially perform the contract when he refused to acquiesce to French's demand that he complete the dirt work for the driveway.

French also contends that Wilkinson materially breached the contract when he denied that the parties' agreement obligated him to install wood slats on the barn, insulate the barn with spray

---

[282] Id.

[283] Id. at *11.

[284] Id.

foam, install horse corrals and runs, and stain the concrete floors.  With respect to the stained concrete floors, Wilkinson credibly testified that the floors would be stained as part of the Barndominium project's finish out.  Because French failed to pay the September 14 invoice, Wilkinson elected to cease work on the project and was thus unable to complete the finish out. Consequently, Wilkinson's failure to stain the floors was not a material breach.

With respect to the work on the barn, including slats and spray foam, Mr. Pack, French's expert, testified that the addition of barn slats, barn spray foam, and other barn work would have placed the project cost at around $240,000.00.  The parties, as discussed above, disagree as to whether these items were also part of the contract.  Given that the parties agreed to a sub-$200,000.00 budget for the entire Barndominium project, the parties contemplated that some items would not be included.  Coupling the budgetary restriction with French's dubious credibility, the Court finds that Wilkinson did not materially breach the Barndominium agreement when he failed to install barn slats, barn spray foam, and complete other barn-related work.

Accordingly, Wilkinson did not materially breach the parties' contract.  Therefore, French's nonpayment of the September 14 invoice is unexcused, and her breach of contract action fails.  Further, French's nonpayment of the September 14 invoice constitutes a material breach.

### (d.)    French is Entitled to Remedial Damages, But Failed to Provide Evidence of Remedial Damages

Homeowners asserting breach of a construction contract may nevertheless recover damages if the builder substantially performed.[285]  These damages, which the Texas Supreme Court styled as "remedial measure of damages," are calculated in the following manner:  the difference between the cost of completion and unpaid balance on the contract price.[286]

---

[285] *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.*, 642 S.W.2d 160, 164 (Tex. 1982).

[286] *Id.*

In this case, French failed to present any evidence supporting a cost-of-completion damages.  Similarly, Wilkinson failed to present any evidence of damages arising from his breach of contract counterclaim against French.  Therefore, neither party is entitled to damages on their breach of contract claims.

### (3.)    Negligence

French argues that Wilkinson was negligent when he continued construction without a professionally drawn set of architectural plans and in the actual construction of the home.  Further, French claims that Wilkinson negligently supervised the subcontractors on the Barndominium project.[287]  In addition to economic damages, French also asserts that she is entitled to mental anguish damages.[288]

### (a.)    The Economic Loss Rule Bars French from Recovering on Her Claims Arising Out of the Barndominium Contract

In cases that implicate both contractual obligations and tort duties, Texas courts apply the economic loss rule.  The economic loss rule bars a plaintiff from recovering in tort for economic losses arising from a contract counterparty's failure to perform their contractual obligations: "if the defendant's conduct . . . would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract."[289]  However if the alleged injury "would give rise to liability independent of the fact that a contract exists between the

---

[287] *See* PTO, at Ch. C, at ¶ rr.

[288] *See* PTO, at Ch. C, at ¶ sssss.

[289] *See Shakeri*, 816 F.3d 283, 292 (5th Cir. 2016) (quoting *S.W. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991)).

parties," the plaintiff may recover in both contract and tort.[290]  Such injuries include physical harm or damage to property other than the property covered by the contract.[291]

The economic loss rule applies in disputes between homeowners and their builders.  For example, in *Jim Walters Homes*, the homeowners' "injury was that the house they were promised and paid for was not the house they received."[292]  Accordingly, the economic loss rule barred the homeowners from recovering damages in tort for the general contractor's "grossly negligent" supervision of construction.[293]   The court acknowledged that the homeowners could have recovered in tort for "a distinct tortious injury with actual damages," such as mental anguish damages, provided that the homeowners' submit that issue to the factfinder.[294]

Here, like the homeowners in *Jim Walters Homes*, French entered into a contract with a contractor, Wilkinson, to construct a residential home.  Further, French's claimed injury is that the home—the Barndominium—she was promised was not the one she was set to receive.  Indeed, the conduct underlying French's claim for damages—Wilkinson's failure to use a professionally made set of architectural plans, Wilkinson's allegedly inadequate construction, and Wilkinson's deficient supervision of subcontractors—could give rise to tort claims arising out of a breach of various duties if the damages extended to person or property that is not the subject of the Barndominium contract.  But like the grossly negligent supervision of subcontractors in *Jim Walters Homes*, Wilkinson's alleged conduct produces an injury that is an "economic loss to the

---

[290] *See id.*

[291] *See Shakeri*, 816 F.3d at 292–93 (quoting *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007)).

[292] *See Jim Walters Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986).

[293] *Id.*

[294] *Id.*; *see also Montgomery Ward & Co. v. Scharrenbeck*, 204 S.W.2d 508 (Tex. 1947) (holding that negligent installation of a water heater that burned down an entire home gave rise to both contractual and independent tort damages).

subject of the contract," the Barndominium.[295]  Therefore, per the economic loss rule, French must

rely on contractual remedies to recover on her claims arising from Wilkinson's failure to use a

professionally made set of architectural plans, Wilkinson's allegedly inadequate construction , and

Wilkinson's deficient supervision of subcontractors.

### (b.)     French is Not Entitled to Tort Damages for Mental Anguish

Unlike the *Jim Walters Homes* homeowners, French submitted a distinct tortious injury

with its own compensatory damages to this Court.  She alleges she suffered mental anguish

damages as a result of Wilkinson's negligence vis-à-vis his failure to use a professionally made

set of architectural plans, Wilkinson's allegedly inadequate construction, and Wilkinson's

deficient supervision of subcontractors.  Accordingly, the Court will review whether Wilkinson

was negligent solely with respect to Frech's claim for mental anguish damages.

To prevail on her negligence claim, French must show that (1) Wilkinson owed her a duty

to exercise reasonable care, (2) Wilkinson breached that duty, (3) Wilkinson's breach proximately

caused Wilkinson's injury, and (4) French suffered resulting injury.[296]

Taking the elements out of order, French alleges she suffered from "mental anguish" and

is thus entitled to damages.  To recover for mental anguish damages, French should introduce

"direct evidence of the nature, duration, and severity of [her] mental anguish, thus establishing a

substantial disruption to [her] daily routine."[297]  Absent such evidence, Texas courts must utilize

"close judicial scrutiny of the record" to determine if there is any evidence of a mental distress that

is "more than mere worry, anxiety, vexation, embarrassment, or anger."[298]

---

[295] *See Jim Walter Homes*, 711 S.W.2d at 618.

[296] *See Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001) (citations omitted).

[297] *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

[298] *Id.*

69

By way of example, in *Parkway Co. v. Woodruff*, the Texas Supreme Court held that aggrieved homeowners failed to meet their evidentiary burden concerning mental anguish damages.[299]  In that case, the homeowners sued a builder after repeated flooding damaged their home's foundation; they sought, among other damages, damages for mental anguish.[300]  To substantiate their claim for mental anguish damages, the homeowners testified that they were disturbed about feeling "hot"; that it was "not pleasant" to walk around the home's hot floors; that living in the flooded and damaged home was "upsetting"; that some "friction" arose between the homeowners; and that they were not "afraid," but just "upset."[301]  The Texas Supreme Court held that this testimony cited "the existence of 'mere emotions,'" and in no way established compensable mental anguish.[302]  Further, the court held that damage to a home, unlike a demonstrated threat to one's or one's close family member's physical safety or reputation, was not a circumstance that permitted an inference of mental anguish.[303]

Here, to substantiate her claim for mental anguish damages, French testified that she was "depressed" but not on any medication.  Further, she testified that she believed she was "entitled" to mental anguish damages.  That was the extent of her testimony regarding mental anguish damages.  Like in *Parkway*, French provided some evidence tending to show that she experienced "mere emotions."  This evidence, as in *Parkway*, is woefully insufficient to establish compensable mental anguish damages.  Further, as in *Parkway*, damage to a Barndominium is not within the

---

[299] *Id.* at 445.

[300] *Id.* at 437.

[301] *Id.* at 445.

[302] *Id.*

[303] *See id.*

few circumstances that permit an inference of mental anguish. Accordingly, French cannot recover mental anguish damages.

Therefore, because damages caused by the alleged negligence is an element of a negligence cause of action, French cannot maintain a negligence action against Wilkinson. Thus, the negligence claim is denied.

### (4.) Breach of Express and/or Implied Warranties, Common Law Fraud, and Fraudulent Inducement.

French and Mickels additionally allege, separate and apart from their DTPA breach of warranty claims, that under the common law Wilkinson: breached express and/or implied warranties owed to French,[304] defrauded French and Mickels,[305] and fraudulently induced French to enter into the Barndominium contract.[306]

The Texas Supreme Court has held that "[t]he DTPA does not represent a codification of the common law. A primary purpose of the enactment of the DTPA was to provide consumers with a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit."[307] Further, plaintiffs may not recover under both the DTPA and the common law for damages arising from the same act.[308]

Here, the Court found that French is entitled to a recovery under the DTPA for breach of the implied warranty of good and workmanlike construction. Consequently, French cannot

---

[304] Amended Complaint, at ¶¶ 59–65.

[305] Amended Complaint, at ¶¶ 66–71.

[306] Amended Complaint, at ¶¶ 72–75.

[307] *Smith v. Baldwin*, 611 S.W. 2d 611, 616 (Tex. 1980).

[308] *See* Tex. Bus. & Com. Code § 17.43 ("[N]o recovery shall be permitted under both [the DTPA] and another law of both damages and penalties for the same act or practice").

71

similarly recover under a common law breach of warranty theory.  Therefore, French's common law breach of warranty claims are denied.

Turning to French's fraud claim,  the following elements make up a common law fraud claim under Texas law:  (1) a material representation was made by the defending party; (2) the representation was false; (3) when the representation was made, the defending party knew it was false or made it recklessly without  knowledge of its truth as a positive assertion; (4) the defending party intended that the other party to rely on the representation; (5) the other party acted in reliance on the representation; and (6) the other party suffered injury. [309]  A fraudulent inducement claim has the same elements as a common law fraud claim plus the additional element that the fraud relates to an agreement entered into by the defending party and the other party.[310]

A representation is material if "a reasonable person would attach importance to and would be induced to act on the information in determining his choice of actions in the transaction in question."[311]   While "pure expressions of opinion" are ordinarily not actionable in fraud, an opinion by one with superior knowledge of past or present facts may be actionable in fraud.[312]

The Court has already determined, in connection French's DTPA misrepresentation claims, that the only material misrepresentation Wilkinson made was billing French $3,987.45 for uninstalled curb footings.  French cannot recover twice on this claim.  Accordingly, French's common law fraud and fraudulent inducement claims are denied.

---

[309] See Saenz v. Gomez, 899 F.3d 384, 391 (5th Cir. 2018) (citing In re FirstMerit Bank, N.A., 52 S.W.3d 749, 758 (Tex. 2001).

[310] Johnson v. World Alliance Fin. Corp., 830 F.3d 192, 198 (5th Cir. 2016) (citing In re VNA, Inc., 403 S.W.3d 483, 487 (Tex. App.—El Paso 2013, no pet.)); see also Anderson v. Durant, 550 S.W.3d 605, 614 (Tex. 2001).

[311] See Italian Cowboy Partners, Ltd. V. Prudential Ins. Co. of America, 341 S.W.3d 323, 337 (Tex. 2011).

[312] Id. at 378 (quotations and citations omitted).

With respect to Mickels' common law fraud claim, Wilkinson directly told Mickels that Wilkinson would install two culverts, the frame and door, and the road base at some time.  These statements were made after French and Wilkinson entered the Barndominium contract, after Wilkinson started construction, after Wilkinson began invoicing French, and after French paid on those initial invoices.  But more importantly, when these statements were made, these statements related to the future.  Consequently, because these statements did not pertain to past or present facts, they do not qualify as actionable misrepresentations in fraud.

Therefore, Mickels's fraud claims are denied.

### (5.)    *Conversion*

French alleges Wilkinson "converted funds for his own purposes and failed to use the funds for the project."[313]

In Texas, conversion is "the wrongful exercise of dominion and control over another's property in violation of the property owner's rights."[314]  A cause of action for the conversion of money exists, but only if "the money is delivered to another party for safekeeping, the keeper claims no title, and the money is required and intended to be segregated, either substantially in the form in which it was received or as an intact fund."[315]  Plaintiffs who fail to trace the exact sum of money allegedly converted cannot maintain a conversion cause of action.[316]  Additionally, conversion is not an appropriate remedy for a plaintiff seeking to recover on a debt, the satisfaction of which is the payment of money generally.[317]

---

[313] Amended Complaint, at ¶ 77.

[314] *ITT Commercial Fin. Corp. v. Bank of the W.*, 166 F.3d 295, 305 (5th Cir. 1999).

[315] *See Dixon v. State*, 808 S.W.2d 721, 723 (Tex. App—Austin 1991, writ dism'd w.o.j) (quoted in *Mitchell Energy Corp. v. Samson Res. Co.*, 80 F.3d 976, 984 (5th Cir. 1996)).

[316] *See Taylor Pipeline Cost., Inc. v. Directional Road Boring, Inc.*, 438 F.Supp.2d 696, 708 (E.D. Tex. 2006) (citation omitted).

[317] *See id.* (quoting *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.—Dallas 1992, writ denied)).

Here, French presented no evidence that traced a specific sum money into Wilkinson's possession.  Further, French claims she is owed money for services either unrendered or rendered unsatisfactorily.  These claims would be satisfied by a payment of money generally as opposed to a specific, exact sum.  Accordingly, French is seeking to recover money on a debt.  Therefore, conversion is not a proper remedy.

Consequently, French's claim for conversion is denied.

## B.    Nondischargeability Under Bankruptcy Code Section 523(a)(2)(A)

The Court now turns to the substantive bases for nondischargeability alleged by French and Mickels.  Section 523(a)(2)(A) provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor for any debt for, among other things, "money . . . to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . ."[318]  French and Mickels have the burden of proving nondischargeability under section 523(a)(2)(A) by a preponderance of the evidence.[319]

French and Mickels allege that Wilkinson should be denied a discharge with respect to the alleged debt owed to them because he "induced . . . French to enter into the contract by misrepresentations as to the cost of the project, his qualifications and experience, that he had liability insurance, that he would provide her a copy of the written contract, the work that would be done and the quality of such work, and by his grossly fraudulent promises."[320]  Accordingly, they seek to except their debt from Wilkinson's discharge based on the  "false representation" prong of section 523(a)(2)(A).

---

[318] 11 U.S.C. § 523(a)(2)(A).

[319] *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th. Cir. 2018).

[320] Amended Complaint, at ¶ 31.

To establish that their debt is excepted from the debtor's bankruptcy discharge under section 523(a)(2)(A), a creditor must show the following: (1) the debtor made a false representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intent to deceive the creditor; (4) the creditor actually and justifiably relied on the representation; and (5) the creditor sustained a loss as a proximate result.[321]  A "false representation" for section 523(a)(2)(A) purposes "impl[ies] elements that the common law has defined [it] include.[322]

The above section 523(a)(2)(A) "false representation" elements mirror the elements for common law fraud and fraudulent inducement under Texas law.  As indicated above, Wilkinson misrepresented that curb footings had been constructed in billing French $3,987.45.  Thus, such damages are also nondischargeable under section 523(a)(2)(A).  Otherwise, for the same reasons the Court denied French's other DTPA misrepresentation, common law fraud, and fraudulent inducement claims, the Court also denies that French's debt to that extent is nondischargeable under section 523(a)(2)(A).  Additionally, for the same reasons the Court denied Mickels' common law fraud claim, the Court also denies that Mickels's debt (which amounts to $0.00) is nondischargeable under section 523(a)(2)(A).

With respect to attorney's fees, a nondischargeability determination based on a state-court damages award encompasses both the actual damages and any awarded attorney's fees.[323]  Thus, the amount of attorney's fees incurred in connection with prosecuting the claim for $3,987.45 is also nondischargeable.  Attorney's fees issues are further addressed below.

---

[321] *Saenz v. Gomez (In re Saenz)*, 899 F.3d 384, 394 (5th Cir. 2018).

[322] *Field v. Mans*, 516 U.S. 59, 69 (1995).

[323] *See Cohen v. de la Cruz*, 523 U.S. 213, 219–223 (1998).

### C.    Nondischargeability Under Bankruptcy Code Section 523(a)(6)

The second substantive basis for nondischargeability alleged by French and Mickels is section 523(a)(6) of the Bankruptcy Code.  Section 523(a)(6) provides that a bankruptcy discharge obtained by an individual debtor does not discharge the debtor from any debt for "willful and malicious injury by the debtor to another entity or the property of another entity."[324]  French and Mickels bear the burden of proving nondischargeability under section 523(a)(6) by a preponderance of the evidence.

The Supreme Court has explained that, to satisfy the requirements of section 523(a)(6), a creditor must prove that the injury inflicted was a deliberate or intentional injury by the debtor, not simply the byproduct of a deliberate or intentional act by the debtor.[325]  Therefore, to satisfy the willful and malicious standard of section 523(a)(6), the Fifth Circuit has required proof of either (a) a subjective motive to cause harm of the part of the debtor, or (b) an objective substantial certainty of harm from the debtor's actions.[326]

Here, French has failed to show that Wilkinson exhibited a subjective motive to cause harm.  Wilkinson aimed to build French the Barndominium for under $200,000.00, he endeavored to complete the project, and he only ceased working after French failed to pay the September 14, 2020, invoice.  Indeed, the DTPA breach of the implied warranty of good and workmanlike construction damages, $12,450.00, resulted from this very desire to build an "economical" home.

Moreover, Wilkinson's neither had a subjective intent to overbill French $6,378.45 nor was there an objective substantial certainty that overbilling French would inflict harm.  Overbilling could qualify as a section 523(a)(6) willful or malicious injury if, for example, the debtor

---

[324] 11 U.S.C. § 523(a)(6).

[325] *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).

[326] *Miller v. JD Abrams Inc.* (*In re Miller*), 156 F.3d 598, 606 (5th Cir. 1998), *cert denied*, 526 U.S. 1016 (1999).

"knowingly and intentionally" submits "fraudulently inflated invoices in order to induce overpayment."[327]   Here, however, Wilkinson inadvertently submitted "inflated invoices" to French.  Accordingly, French's $6,378.45 in damages arising from the inflated invoices did not arise from a willful or malicious injury and is therefore dischargeable.

However, there was an objective substantial certainty of harm with respect to Wilkinson's billing French $3,987.45 for "curb footings" that were never constructed.  Part of Wilkinson's job as a general contractor was to monitor subcontractors to ensure work was being completed; another part was to ensure the invoices billed to French reflected the work done.  Further, French—at that point in time—had dutifully paid all invoices without question.  Accordingly, there was an objective substantial certainty that French would pay for services that were not rendered, and her payment of $3,987.45 constitutes a debt resulting from a willful and malicious injury.

Further, given that "attorney's fees incurred in the creation of a nondischargeable debt are also nondischargeable,"[328] French's attorney's fees arising solely in relation to litigating the liability and nondischargeability of the $3,987.45 debt for overbilling are excepted from Wilkinson's discharge.

### *CONCLUSION*

Based upon all of the foregoing, the Court finds and concludes that Wilkinson owes French a total debt of $16,437.45 for DTPA violations, of which $3,987.45 is nondischargeable under sections 523(a)(2)(A) and 523(a)(6) of the Bankruptcy Code, along with any attorney's fees incurred in relation to prosecuting such claim amount.   In accordance with Federal Rule of

---

[327] *See Christensen v. Lay (In re Lay)*, Adv No. 11–4234, Bankr. No. 11–43085, 2013 WL 868558, at *12 (Bankr. E.D. Tex., March 1, 2013).

[328] *See Yagi v. Hilgartner (In re Hilgartner)*, 91 F.4th 186, 193 (4th Cir. 2024); *see also Snook v. Popiel (In re Snook)*, 168 F. App'x 577, 578 (5th Cir., February 22, 2006).

Bankruptcy Procedure 7054, which adopts Federal Rule of Civil Procedure 54(d)(2)(A)-(C), the

Court will, by separate order, set a supplemental hearing to address requests for attorney's fees.

Upon the determination of the amount of attorney's fees to be awarded, the Court will separately

issue a judgment in conformity herewith.

# # # END OF AMENDED MEMORANDUM OPINION # # #